# Illinois Official Reports

## Appellate Court

<div style="border:2px solid black;">

### *McAllister v. Illinois Workers' Compensation Comm'n,*
### 2019 IL App (1st) 162747WC

</div>

| | |
|---|---|
| Appellate Court Caption | KEVIN McALLISTER, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (North Pond, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division<br>Docket No. 1-16-2747WC |
| Filed<br>Rehearing denied | March 22, 2019<br>April 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-50097; the Hon. Ann Collins-Dole, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Karolina M. Zielinska, of Elfenbaum Evers & Amarilio, P.C., of Chicago, for appellant.<br><br>Jason D. Kolecke, of Hennessy & Roach, P.C., of Chicago, for appellee. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Hudson and Moore concurred in the judgment and opinion. Presiding Justice Holdridge specially concurred, with opinion, joined by Justice Hoffman. |

**OPINION**

¶ 1      Claimant, Kevin McAllister, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2014)), seeking benefits for a knee injury he sustained on August 7, 2014, while he was working as a sous chef for the employer, North Pond. Following a hearing, an arbitrator found that claimant sustained an accidental injury arising out of and in the course of his employment and awarded him temporary total disability (TTD) benefits, permanent partial disability (PPD) benefits, and medical expenses. Additionally, the arbitrator imposed penalties under sections 19(k) and 19(*l*) of the Act (*id.* § 19(k), (*l*)) and attorney fees under section 16 of the Act (*id.* § 16), finding the employer's prior refusal to pay TTD and medical expenses related to the August 7, 2014, work accident was dilatory, retaliatory, and objectively unreasonable.

¶ 2      The employer sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). The Commission, with one commissioner dissenting, found that claimant had failed to prove that his August 7, 2014, knee injury arose out of his employment and reversed the arbitrator's decision. Claimant appealed the Commission's decision to the circuit court of Cook County, which confirmed the Commission's decision.

¶ 3      This appeal followed.

¶ 4                              I. BACKGROUND

¶ 5      Claimant worked for the employer as a sous chef. His job duties included checking orders, arranging the restaurant's walk-in cooler, making sauces, "prepping," and cooking.

¶ 6      On August 7, 2014, claimant was at work getting ready for service while the other restaurant employees were beginning to set up their stations. One of the cooks was looking for a pan of carrots he had cooked earlier in the day. Claimant testified that the cook was "busy doing other things" and claimant "had some time," so claimant began looking for the carrots. Claimant began his search in the walk-in cooler because that was where the cook said he had put the carrots. He checked the top, middle, and bottom shelves in the cooler, but he was unable to locate the carrots. Claimant testified that he then knelt down on both knees to look for the carrots under the shelves because "sometimes things get knocked underneath the shelves *** on[to] the floor." He did not find anything on the floor. As claimant stood back up, his right knee "popped" and locked up, and he was unable to straighten his leg. He "hopped" over to a table where he stood "for a second," and then hopped another 20 or 30 feet to the office where he told his boss about the injury.

¶ 7      During cross-examination, claimant testified that he was not carrying or holding anything when he stood up from a kneeling position and injured his knee. Nothing struck his knee or fell on his knee. He did not trip over anything, and he noticed no cracks or defects on the floor. Although claimant testified that it was "always wet" in the walk-in cooler, he did not notice "anything out of the ordinary" at the time of his injury. He did not claim that he slipped on a wet surface. Rather, he was simply standing up from a kneeling position when he felt his knee pop. Claimant agreed that the kneeling position he assumed while looking for the carrots was similar to the position he would be in while "looking for a shoe or something under the bed."

¶ 8        Shortly after the accident, the employer's general manager took claimant to the emergency room (ER) at St. Joseph's Hospital. Claimant reported experiencing a pop in his knee and a sudden onset of right knee pain after rising from a kneeling to standing position. After taking X-rays and evaluating claimant, the ER physicians assessed claimant as suffering from right knee pain and a possible ligamentous injury. They provided claimant with crutches and an Ace bandage and advised him to follow up with an orthopedic doctor and obtain a magnetic resonance imaging (MRI) scan.

¶ 9        On August 11, 2014, claimant saw Dr. David Garelick, an orthopedic surgeon at the Illinois Bone and Joint Institute. Dr. Garelick noted that he had surgically repaired the medial meniscus of claimant's right knee approximately one year earlier, on August 26, 2013. The doctor noted that claimant was doing well following that surgery until August 7, 2014, when he reinjured his right knee while standing up from a squatting position. Dr. Garelick diagnosed a possible recurrent medial meniscus tear of the right knee and ordered an MRI of that knee.

¶ 10       Two days later, an MRI was performed on claimant's right knee. The MRI showed a low-grade injury of the ACL without any complete disruption. There was also a bucket-handle tear of the medial meniscus and moderate knee joint effusion. Dr. Garelick opined that the recent MRI showed a re-tear of medial meniscus consistent with a bucket-handle medial meniscus tear. He recommended surgery.

¶ 11       On August 15, 2014, Dr. Garelick performed an arthroscopy and a partial medial meniscectomy on claimant's right knee. Dr. Garelick removed approximately 80% of claimant's medial meniscus because he concluded that the meniscal tear was not repairable. The postsurgical diagnosis was a bucket-handle medial meniscal tear of the right knee.

¶ 12       After the surgery, Dr. Garelick prescribed medication and physical therapy. Claimant testified that he attended only four of eight therapy sessions because therapy was expensive and he had to pay out of pocket, and because he was already familiar with the exercises from undergoing physical therapy in the past.

¶ 13       On September 15, 2014, Dr. Garelick released claimant to work without restrictions. He discharged claimant from care one week later. Claimant did not return to Dr. Garelick or to any other doctor for further treatment to his right knee.

¶ 14       As a result of the accident and his subsequent surgery, claimant was taken off work from August 8, 2014, until September 15, 2014, and he incurred $10,454.25 in medical expenses. Claimant paid out of pocket for his surgery, medication, and physical therapy. The employer took the position that claimant's right knee injury did not arise out of his employment, and it refused to pay claimant TTD benefits or medical expenses.

¶ 15       Claimant returned to work on September 15, 2014, and was working at the time of the arbitration hearing. He testified that he typically worked no more than 10 hours per day but that he sometimes worked up to 16 hours. His job required him to stand for all but one hour of each workday. Claimant's right leg felt sore and achy at times, and he sometimes experienced sharp pain after working all day. His leg felt sore after work. Claimant took Ibuprofen or aspirin for his pain three or more days per week.

¶ 16       The arbitrator found claimant sustained an accidental injury arising out of and in the course of his employment on August 7, 2014. She determined claimant was injured due to an employment-related risk because he "was injured while performing his job duties, *i.e.*, looking for food products to prepare the food for service that evening." The arbitrator found that "[t]he

act of looking for a food product was an act that the employer might reasonably have expected [claimant] to perform so that he could fulfill his assigned duties as a sous chef." She also found that claimant's current condition of ill-being was causally related to the work-related injuries he sustained on August 7, 2014, and awarded him TTD benefits, PPD benefits, and medical expenses. As stated, the arbitrator further imposed penalties under sections 19(k) and 19(*l*) of the Act and awarded claimant attorney fees under section 16 of the Act.

¶ 17    The employer sought review of the arbitrator's decision before the Commission. Ultimately, the Commission reversed, finding claimant failed to prove that he sustained an accidental injury arising out of his employment. It determined claimant's injury did not result from an employment-related risk as claimant was injured after "simply standing up after having kneeled one time" and such activity "was not particular to [claimant's] employment." The Commission, instead, found that claimant had been subjected to a neutral risk, "which had no particular employment or personal characteristics." Further, it found that the evidence failed to show that claimant was exposed to that neutral risk to a greater degree than the general public. Thus, it determined claimant was not entitled to compensation under the Act. On judicial review, the circuit court of Cook County confirmed the Commission's decision.

¶ 18    This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, claimant argues that the Commission erred in finding that he failed to prove that he sustained an accidental injury arising out of his employment.

¶ 21    As an initial matter, the parties dispute the standard of review that should govern our analysis. Claimant argues that we should review the Commission's decision *de novo* because the relevant facts are undisputed and susceptible to only one reasonable inference. The employer contends that the undisputed facts give rise to multiple reasonable inferences. Thus, the employer argues that we should affirm the Commission's decision unless it is against the manifest weight of the evidence. We agree with the employer.

¶ 22    "Whether a claimant's injury arose out of or in the course of his employment is typically a question of fact to be resolved by the Commission, and the Commission's determination will not be reversed unless it is against the manifest weight of the evidence." *Kertis v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120252WC, ¶ 13, 991 N.E.2d 868. "However, when the facts are undisputed and susceptible to but a single inference, the question is one of law subject to *de novo* review." *Suter v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 130049WC, ¶ 15, 998 N.E.2d 971.

¶ 23    In this case, the facts relating to the circumstances and mechanics of claimant's injury are undisputed, *i.e.*, the parties agree that claimant injured his right knee at work while standing up from a kneeling position after looking for a missing pan of carrots in the walk-in cooler. However, those undisputed facts were subject to more than a single inference. Specifically, the facts could support different inferences as to whether looking for the misplaced carrots was required by or incidental to claimant's job duties. The facts could also support different inferences as to whether the risk of injury that claimant confronted at the time of his injury was peculiar to or enhanced by his employment. Accordingly, we review the Commission's decision under the manifest weight of the evidence standard. See *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, ¶ 18, 13 N.E.3d 1252 (applying a manifest weight standard of review where the facts presented were subject to more than a

- 4 -

single inference as to whether the claimant's act of reaching into a box was "one to which the general public was equally exposed or whether claimant was exposed to an increased risk by reaching beyond normal limits by virtue of his employment"). For a finding of fact to be against the manifest weight of the evidence, a conclusion opposite to the one reached by the Commission must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896 (1992).

¶ 24    We now turn to the merits of claimant's argument. To recover benefits under the Act, a claimant bears the burden of proving by a preponderance of the evidence that his injury "ar[ose] out of" and "in the course of" his employment. 820 ILCS 305/1(d) (West 2014). Both elements must be present to justify compensation. *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 105, 853 N.E.2d 799, 803 (2006). In the present case, the parties do not dispute that claimant's injury occurred "in the course" of his employment. The disputed issue in this appeal concerns the "arising out of" element of a workers' compensation claim.

¶ 25    The requirement that the injury arise out of the employment concerns the origin or cause of the claimant's injury. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203, 797 N.E.2d 665, 672 (2003). The occurrence of an accident at the claimant's workplace does not automatically establish that the injury "arose out of" the claimant's employment. *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 393, 212 N.E.2d 882, 885 (1995). Rather, "[t]he 'arising out of' component is primarily concerned with causal connection" and is satisfied when the claimant has "shown that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Sisbro*, 207 Ill. 2d at 203.

¶ 26    After determining the mechanism of a claimant's injury (which is undisputed in this case), the Commission's first task in determining whether the injury arose out of the claimant's employment is to categorize the risk to which the claimant was exposed in light of its factual findings relevant to the mechanism of the injury. *First Cash Financial Services*, 367 Ill. App. 3d at 105. There are three types of risks to which employees may be exposed: (1) risks that are distinctly associated with employment; (2) risks that are personal to the employee, such as idiopathic falls; and (3) neutral risks that do not have any particular employment or personal characteristics. *Potenzo v. Illinois Workers' Compensation Comm'n*, 378 Ill. App. 3d 113, 116, 881 N.E.2d 523, 527 (2007); see also *Brady v. Louis Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542, 552, 578 N.E.2d 921, 925 (1991) (noting that "neutral" in workers' compensation terms means "neither personal to the claimant nor distinctly associated with the employment" (internal quotation marks omitted)).

¶ 27    "Injuries resulting from a risk distinctly associated with employment, *i.e.*, an employment-related risk, are compensable under the Act." *Steak 'n Shake v. Illinois Workers' Compensation Comm'n*, 2016 IL App (3d) 150500WC, ¶ 35, 67 N.E.3d 571. "Risks are distinctly associated with employment when, at the time of injury, 'the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties.' " *Id.* (quoting *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58, 541 N.E.2d 665, 667 (1989)); see also *The Venture—Newberg-Perini, Stone & Webster v. Illinois Workers' Compensation Comm'n*, 2013 IL 115728, ¶ 18, 1 N.E.3d 535 (stating the supreme court "has found that injuries arising from three categories of

acts are compensable: (1) acts the employer instructs the employee to perform; (2) acts which the employee has a common law or statutory duty to perform while performing duties for his employer; (3) acts which the employee might be reasonably expected to perform incident to his assigned duties"). "A risk is incidental to the employment when it belongs to or is connected with what the employee has to do in fulfilling his duties." *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45, 509 N.E.2d 1005, 1008 (1987).

¶ 28    Alternatively, neutral risks—risks that have no particular employment characteristics— "generally do not arise out of the employment and are compensable under the Act only where the employee was exposed to the risk to a greater degree than the general public." *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014, 944 N.E.2d 800, 804 (2011). "Such an increased risk may be either qualitative, such as some aspect of the employment which contributes to the risk, or quantitative, such as when the employee is exposed to a common risk more frequently than the general public." *Id.*; see also *Campbell "66" Express, Inc. v. Industrial Comm'n*, 83 Ill. 2d 353, 357, 415 N.E.2d 1043, 1045 (1980) (finding the Commission could reasonably conclude from the evidence presented "that the necessity for a truck driver to be on the highway at all times of the day and night, and in all kinds of weather, subjected the claimant *** to a greater risk of injury from [a] tornado than that to which the general public in that vicinity was exposed"); *Chmelik v. Vana*, 31 Ill. 2d 272, 280, 201 N.E.2d 434, 439 (1964) (stating that "[t]he regular and continuous use of the parking lot by employees, most particularly at quitting time when there is a mass and speedy exodus of the vehicles on the lot, would result in a degree of exposure to the common risk beyond that to which the general public would be subjected").

¶ 29    When categorizing risk, the "first step *** is to determine whether the claimant's injuries resulted from an employment-related risk." *Steak 'n Shake*, 2016 IL App (3d) 150500WC, ¶ 38. "[W]hen a claimant is injured due to an employment-related risk—a risk distinctly associated with his or her employment—it is unnecessary to perform a neutral-risk analysis to determine whether the claimant was exposed to a risk of injury to a greater degree than the general public." *Young*, 2014 IL App (4th) 130392WC, ¶ 23.

¶ 30    Here, the Commission determined claimant was not injured as the result of an employment-related risk. That finding is supported by the record and an opposite conclusion from that reached by the Commission is not clearly apparent.

¶ 31    The record shows claimant worked for the employer as a sous chef. His job duties included checking orders, arranging the employer's walk-in cooler, making sauces, "prepping," and cooking. Claimant was injured as he stood up from a kneeling position after volunteering to look for a misplaced pan of carrots for a coworker. However, he did not establish that he was instructed to perform, or that he had a duty to perform, that particular activity. Further, it does not appear the activity was incidental to his employment, in that it was not necessary to the fulfillment of his specific job duties. Ultimately, it was for the Commission to decide whether the risk to which claimant was subjected was incidental to his work for the employer. In this instance, the record was such that the Commission could properly find that the risk to claimant was too far removed from the requirements of his employment to be considered an employment-related risk. We find no error in the Commission's determination that the activity at issue had no particular employment characteristics and, therefore, claimant was not injured as the result of an employment-related risk.

¶ 32    Next, the Commission did characterize the risk to which claimant was exposed as a neutral risk; however, it also found that claimant failed to establish that he was exposed to that neutral risk to a greater degree than the general public and, therefore, his injury was noncompensable. Again, the record contains support for that decision, and an opposite conclusion is not clearly apparent.

¶ 33    Claimant testified that he was not carrying or holding anything when he stood up from a kneeling position and injured his knee. Nothing struck his knee or fell on his knee. Claimant did not trip over anything, and he did not notice any cracks or defects in the floor. Although claimant testified that it was "always wet" in the walk-in cooler, he did not notice "anything out of the ordinary," and he did not claim that he slipped on a wet surface. Rather, he was simply standing up from a kneeling position when he felt his knee pop. Claimant agreed that the kneeling position he assumed while looking for the carrots was similar to the position he would be in while "looking for a shoe or something under the bed." Ultimately, claimant failed to establish that his employment increased or enhanced his risk of injury in any way. See *Caterpillar Tractor*, 129 Ill. 2d at 62-63 (finding the claimant, who was injured while traversing a curb to reach his vehicle, was subjected to a noncompensable neutral risk); *Noonan v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 152300WC, ¶ 30, 65 N.E.3d 530 (finding the claimant was not exposed to the neutral risk of reaching to retrieve a dropped pen to a greater degree than the general public); *Dukich v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160351WC, ¶ 36, 86 N.E.3d 1161 (denying compensation where the claimant, who fell on pavement that was wet from rainfall, presented no evidence suggesting her employment duties contributed to her fall or enhanced her risk of slipping).

¶ 34    We hold the Commission's determination that claimant failed to show that his injury arose out of his employment was not against the manifest weight of the evidence. Although that holding is dispositive of claimant's appeal, we take this opportunity to address the special concurrence's contention that only a neutral-risk analysis should govern claims like the one in the case at bar, *i.e.*, those that involve "everyday activities" or common bodily movements. For the reasons that follow, we find that proposition of law is flawed and reject its application in both this case and those cases that are similarly situated.

¶ 35    As support for its contention, the special concurrence relies heavily on this court's decision in *Adcock v. Illinois Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC, 38 N.E.3d 587. There, the claimant welded locks while seated on a rolling chair. *Id.* ¶ 3. "He stated that his job required nonstop movement in the chair, including moving back and forth along the length of [his] workstation and swiveling from one point to another." *Id.* ¶ 13. Ultimately, the claimant injured his left knee as he attempted to turn his chair and his body to perform a welding task. *Id.* ¶ 3. The Commission denied the claimant benefits under the Act, finding his injury did not arise out of his employment as the claimant's " 'act of turning in his swivel chair did not expose him to a greater risk than that to which the general public is exposed, and it was not a risk distinctive to his employment.' " *Id.* ¶ 20.

¶ 36    On review, a divided panel of this court characterized the mechanism of the claimant's injury—turning in a chair—as "an activity of everyday life." *Id.* ¶ 33. Further, it held the claimant's risk of injury was not one that was distinctly associated with his employment but, instead, "a neutral risk of everyday living faced by all members of the general public." *Id.* As a result, to obtain compensation, the claimant had to show that he was exposed to that neutral

risk to a greater degree than the general public. *Id.* In the end, the majority held the claimant made such a showing by presenting evidence that his job "required him to turn in a chair more frequently than members of the general public while under time constraints" and reversed the Commission's decision. *Id.* ¶ 34.

¶ 37        In reaching its decision, the *Adcock* majority set forth the following proposition of law:

> "The Commission should not award benefits for injuries caused by everyday activities like walking, bending, or turning, even if an employee was ordered or instructed to perform those activities as part of his job duties, unless the employee's job required him to perform those activities more frequently than members of the general public or in a manner that increased the risk. In other words, a 'neutral risk' analysis should govern such claims." *Id.* ¶ 39.

Under the *Adcock* majority's rule, a claimant who is injured while performing "everyday activities" or common bodily movements can only obtain compensation under the Act by comparing his or her activities or movements to those of the general public. Per *Adcock*, this is true even in situations where the activity or movement is directly related to the specific duties of employment. Accordingly, pursuant to *Adcock* (and the special concurrence), bodily movements, including turning, bending, kneeling, pushing, pulling, reaching, stretching, *etc.*, must always be viewed as common to the general public and cannot be considered distinct or peculiar to the nature of an individual's employment. *Infra* ¶ 88 ("the risks presented by such everyday activities [(such as bending or kneeling)] are not peculiar to any particular line of employment").

¶ 38        Here, the special concurrence proposes adherence to the neutral-risk definition and analysis adopted by the majority in *Adcock*. *Infra* ¶ 80. However, we note that *Adcock*'s analysis is at odds with other decisions of this court—decided both before *Adcock* (*Young*, 2014 IL App (4th) 130392WC; *Autumn Accolade v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120588WC, 990 N.E.2d 901; *O'Fallon School District No. 90 v. Industrial Comm'n*, 313 Ill. App. 3d 413, 729 N.E.2d 523 (2000)) and after that decision was issued (*Steak 'n Shake*, 2016 IL App (3d) 150500WC; *Mytnik v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 152116WC, 67 N.E.3d 946; *Noonan*, 2016 IL App (1st) 152300WC). In particular, the risk analysis utilized in those cases does not automatically exclude from the definition of an employment-related risk activities that might involve common bodily movements or which *Adcock* terms "everyday activities." Accordingly, we reject *Adcock* and its legal analysis. In doing so, we hold that the definition of a neutral risk as set forth in *Adcock* is inconsistent with the purpose of the Act, overly broad, and unsupported by supreme court precedent.

¶ 39        Initially, we find *Adcock*'s statement of law is contrary to the intentions of the Act, as well as the requirement that it must be liberally construed. "The purpose of the Workmen's Compensation Act is to protect the employee against risks and hazards which are peculiar to the nature of the work he is employed to do." *Fisher Body Division, General Motors Corp. v. Industrial Comm'n*, 40 Ill. 2d 514, 517, 240 N.E.2d 694, 696 (1968); see also *Ceisel v. Industrial Comm'n*, 400 Ill. 574, 582, 81 N.E.2d 506, 511 (1948) ("What the law intends is to protect the employee against the risks and hazards taken in order to perform the master's task ***."). As stated, "[t]o obtain compensation under th[e] Act, an employee bears the burden of showing, by a preponderance of the evidence, that he or she has sustained accidental injuries arising out of and in the course of the employment." 820 ILCS 305/1(d) (West 2014). Further,

the Act is "a remedial statute," which "should be liberally construed to effectuate its main purpose—providing financial protection for injured workers." *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 149, 923 N.E.2d 266, 275 (2010).

¶ 40    The special concurrence concludes that *Adcock* is more consistent with the Act's purpose than the rationale applied in this case. However, the manner in which *Adcock* addresses "the arising out of" element gives the Act a narrow construction by broadening the definition of a neutral risk. Such a broad definition bears little resemblance to supreme court precedent (see *infra* ¶ 62 of this opinion for supreme court cases applying a neutral-risk type of analysis). Again, injuries resulting from a neutral risk do not have any particular employment characteristics. *Potenzo*, 378 Ill. App. 3d at 116. They generally do not arise out of the employment and, for such injuries to be compensable, a claimant must establish exposure to the neutral risk to a greater degree than the general public. *Metropolitan Water*, 407 Ill. App. 3d at 1014. An *Adcock* analysis will, in effect, place an extra evidentiary burden on many employees who are injured while performing their job duties or activities closely connected with the fulfillment of their assigned duties by requiring those employees to present evidence comparing their activities with those of the general public. In addition, as pointed out by the special concurrence in *Adcock*:

> "The problem with the majority's analysis is that many workers are employed for the very purpose of engaging in actions and movements performed by the general public. This method of analysis then leads us *** to perform a neutral-risk analysis when a worker has been injured performing the very tasks he was hired to perform. If workers' injuries are first examined to determine whether they were reaching, turning, bending, squatting, or engaging in other common bodily movements at the precise moment of injury, virtually all industrial injuries could be categorized as neutral risks." 2015 IL App (2d) 130884WC, ¶ 56 (Stewart, J., specially concurring, joined by Harris, J.).

¶ 41    Further, our supreme court has set forth, without qualification, the following principles for determining whether an injury arises out of employment:

> "The 'arising out of' component is primarily concerned with causal connection. To satisfy this requirement it must be shown that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury. [Citation.] Stated otherwise, 'an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties. [Citations.] A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties. [Citation.]' " *Sisbro*, 207 Ill. 2d at 203-04.

See also *Ace Pest Control, Inc. v. Industrial Comm'n*, 32 Ill. 2d 386, 388, 205 N.E.2d 453, 454 (1965) ("The *** Act was not intended to insure employees against all accidental injuries but only those which arise out of acts which the employee is instructed to perform by his employer; acts which he has a common law or statutory duty to perform while performing duties for his employer [citations]; or acts which the employee might be reasonably expected to perform incident to his assigned duties."); *Venture—Newberg-Perini*, 2013 IL 115728, ¶ 18 ("This court has found that injuries arising from three categories of acts are compensable: (1) acts the employer instructs the employee to perform; (2) acts which the employee has a common law or

statutory duty to perform while performing duties for his employer; (3) acts which the employee might be reasonably expected to perform incident to his assigned duties."); *Caterpillar Tractor*, 129 Ill. 2d at 58 ("[f]or an injury to 'arise out of' the employment its origin must be in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury" and "an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties").

¶ 42    Thus, supreme court precedent makes clear that an injury should be deemed to have resulted from an employment risk when the risk causing the injury originates from one of the following three types of acts—acts (1) the claimant was instructed to perform by his employer, (2) the claimant had a common law or statutory duty to perform, or (3) that were incidental to the claimant's assigned duties. Risks attendant to these categories of activities have their origin in the claimant's employment. When an employee is injured while performing such acts it cannot be said that he is subject to a neutral risk, *i.e.*, a risk that has no particular employment characteristics and is common to the general public.

¶ 43    The special concurrence suggests that, while proof that an act falls within one of the three categories of acts identified by the supreme court is *necessary* to establish the "arising out of" requirement, such proof alone is not *sufficient* to satisfy that requirement. *Infra* ¶ 87. According to the special concurrence, once one of the above three types of acts is established, supreme court precedent requires an additional analysis be undertaken to determine whether the case involves a risk that is distinct or peculiar to the employment versus a risk that is common to the general public. *Infra* ¶ 88. Our research reveals no supreme court decision that supports such an analysis. In fact, *Sisbro* itself contradicts the special concurrence's interpretation of its language:

> "[W]hether 'any normal daily activity is an overexertion' or whether 'the activity engaged in presented risks no greater than those to which the general public is exposed' are matters to be considered when deciding whether a sufficient causal connection between the injury and the employment has been established in the first instance. We have never found a causal connection to exist between work and injury and then, in a further analytical step, denied recovery based on a 'normal daily activity exception' or a 'greater risk exception.' " 207 Ill. 2d at 211-212.

¶ 44    We find that it is when any of the aforementioned three categories of acts are determined to be present that the risk resulting in injury is "distinctly associated with the employment," *i.e.*, not a neutral risk that is subject to a neutral-risk analysis. See *Brady*, 143 Ill. 2d at 552. For example, in *County of Peoria v. Industrial Comm'n*, 31 Ill. 2d 562, 564, 202 N.E.2d 504, 505 (1964), an off-duty sheriff's deputy was struck by a vehicle and killed while attempting to push a car from a ditch. The employer argued the decedent was not entitled to compensation, in part, because "he was subjected to the accident by virtue of risks to which the general public is exposed and not by reason of his employment." *Id.* The supreme court disagreed, stating that "[w]hile there is no legal duty upon a member of the general public to stop and give aid [citation], the proof [in the case before it] established the existence of such duty upon all deputies in the *** sheriff's office." *Id.* It then held as follows: "It is the *presence of that duty* here which, in our judgment, distinguishes decedent from a member of the general public in his

assistance at the scene of this accident, and exposed him to a risk greater than that faced by the public generally." (Emphasis added.) *Id.* at 564-65. Stated another way, the fact that the employee had a legal duty to act, *i.e.*, a common law or statutory duty to act (category number two in the three aforementioned categories specified in *Venture—Newberg-Perini*), means that his injury was the result of an employment-related risk—a risk that was distinct to his employment.

¶ 45    The nature of an employee's work and the specific duties he or she is required to perform are what determine whether an employee is subjected to an employment risk rather than a neutral risk. In fact, in *County of Peoria*, the supreme court distinguished cases where "the risk in which the accident had its origin was not connected with [the employee's] employment in any manner" and where the employee was injured while "not performing any of the duties of his employment." (Internal quotation marks omitted.) *Id.* at 565. The analysis employed by both *Adcock* and the special concurrence is flawed because it would require injuries resulting from "everyday activities" or common bodily movements to automatically be deemed to have resulted from neutral risks, *i.e.*, those that have no particular employment characteristics and are common to the general public, without any inquiry into, or consideration of, the nature of an employee's work for the employer and his specific job duties.

¶ 46    The special concurrence suggests that the phrase "incidental to" employment (the phrase used by the supreme court to describe the third category of compensable acts) is excessively vague and renders the majority analysis in this case unworkable. *Infra* ¶ 80. It asserts courts will struggle to determine what actions are "incidental to" employment without any evidence on the subject. However, our supreme court instructs that "[a] risk is incidental to the employment when it belongs to or is connected with what the employee *has to do* in fulfilling his duties." (Emphasis added.) *Orsini*, 117 Ill. 2d at 45. Contrary to the special concurrence's argument, there is no guesswork here. The Commission, in exercising its judgment, may determine what acts are incidental to a claimant's employment by considering evidence of the nature of the employment and the claimant's specific job duties. If the act the claimant is performing at the time of injury was not necessary to the fulfillment of his specific job duties, then the act is not incidental to the employment.

¶ 47    Conversely, an *Adcock*-type analysis presents its own definitional problem and invites decisions by the Commission based on speculation or gut level assumptions in the absence of evidence. Under *Adcock*, the Commission would be called upon to determine whether the claimant's risk of injury stems from an "everyday activity," a term that is left undefined in *Adcock* and by the special concurrence, and, if it does, whether there is some feature of the employment that enhances the common risk, either quantitatively or qualitatively, beyond that faced by the general public. Under *Adcock*, an employee whose injury involves a common bodily movement must always establish that he was exposed to an increased risk of injury, either quantitatively or qualitatively, as compared with the general public. However, on what evidence would the Commission be able to deem an employee's common bodily movements, or their frequency, the same as or different from the common bodily movements engaged in by the general public? What sort of evidence would be necessary to establish how often and in what manner members of the general public typically reach, bend, turn, or twist? Would the parties routinely be required to hire expert witnesses to address the *Adcock* neutral-risk analysis? In none of our previous decisions involving employment-risk versus neutral-risk alternatives was evidence presented that would have allowed the Commission to gauge the

general public's common bodily movements. Without such evidence, an *Adcock* analysis will necessarily rest on speculation and conjecture, an infirmity that is not present under the majority analysis.

¶ 48    Ultimately, we find it is clearer and more straightforward to focus the employment risk inquiry on whether the injury-producing act was required by the claimant's specific job duties and not whether it could further be considered an "activity of everyday living." Activities necessary to the fulfillment of a claimant's job duties present risks that are distinct or peculiar to the employment and, as a result, are not common to the general public. In our previous appellate court decisions addressing this issue—*Steak 'n Shake*, *Mytnik*, *Young*, and *Autumn Accolade*—the claimants were performing activities required by their employment and best characterized as employment-related risks. Although the special concurrence suggests each of these claimants might "arguably" have been held entitled to benefits under a neutral-risk analysis (*infra* ¶ 105), there is no indication in any of these cases that evidence existed which would have supported an *Adcock*-type neutral-risk analysis, such as evidence of the general public's frequency of wiping tables (*Steak 'n Shake*), bending (*Mytnik*), or reaching (*Young* and *Autumn Accolade*).

¶ 49    The special concurrence further cites our decision in *Noonan*, 2016 IL App (1st) 152300WC, as an example of how the majority standard is unworkable. *Infra* ¶ 107. In that case, the claimant worked for the employer as a clerk, and his job duties included filling out forms. *Noonan*, 2016 IL App (1st) 152300WC, ¶ 4. Evidence showed the claimant injured his wrist when he reached to retrieve a dropped pen while seated in a rolling chair and fell out of his chair. *Id.* ¶ 5. Employing the same analysis we employ here, we agreed with the Commission's determination that the claimant's injury did not arise out of his employment. *Id.* ¶ 36.

¶ 50    The special concurrence suggests that, under the majority analysis, there was no basis to deny benefits in *Noonan* because the claimant was injured while performing an act incidental to his job duties. *Infra* ¶ 107. We disagree with that characterization. The special concurrence essentially defines "incidental to employment" in a way that is the equivalent of the "positional-risk doctrine," in that it would require no more than that a claimant be present at work to support a finding of compensability. See *Brady*, 143 Ill. 2d at 552 ("Under the positional risk doctrine, an injury may be said to arise out of the employment if the injury would not have occurred but for the fact that the conditions or obligations of the employment placed claimant in the position where he was injured by a neutral force, meaning by 'neutral' neither personal to the claimant nor distinctly associated with the employment." (Internal quotation marks omitted.)). That is not the majority holding. Rather, we recognize that an injury arises out of employment when the employee was performing acts "which the employee might reasonably be expected to perform incident to his assigned duties" and that "[a] risk is incidental to the employment where it belongs to or is connected with what an employee *has to do* in fulfilling his duties." (Emphasis added and internal quotation marks omitted.) *Sisbro*, 207 Ill. 2d at 204. In *Noonan*, the claimant was reaching to retrieve a pen that he dropped as a result of his own clumsiness. The evidence did not establish that he was performing an act that was "incidental to," or what he had to do in, the fulfillment of his specific job duties. Thus, it was not against the manifest weight of the evidence for the Commission to find that the risk resulting injury did not "belong to" or was "connected with" what the claimant "had to do" in filling out forms. See *id.*

- 12 -

¶ 51    We note the special concurrence explicitly asserts that injuries involving common bodily movements can never be found to have resulted from a risk that is peculiar or distinct to a particular line of employment. *Infra* ¶ 88 ("[T]he risks presented by *** activities [(like bending or kneeling)] are not peculiar to any particular line of employment."). However, it contradicts that explicit assertion when addressing this court's decision in *O'Fallon*, 313 Ill. App. 3d 413. In that case, the claimant was a teacher who was "assigned to hall duty." *Id.* at 414. Evidence showed she experienced back pain after she "turned, twisted, and began to pursue" a child who was running in the hallway. *Id.* at 415. Initially, both the arbitrator and the Commission denied the claimant benefits on the basis that the claimant's injuries did not arise out of her employment. *Id.* at 414. This court disagreed with that conclusion, stating as follows:

> "Contrary to the arbitrator's conclusion and the Commission's initial decision, claimant's injury did have an origin in a risk arising out of her employment. [The] [c]laimant was ordered specifically to undertake the risk of pursuing a running student. The need to turn, twist, and pursue a child, thereby stressing her back, is a risk that would not have existed but for [the] claimant's employment obligations as hall monitor." *Id.* at 417.

Significantly, the claimant's risk of injury was not deemed to have been a neutral one—one common to the general public—and, in finding claimant's risk of injury originated in her employment, this court did not engage in any analysis to determine whether the claimant's risk of injury was either quantitatively or qualitatively enhanced by some aspect of her employment. *Id.* Rather, it was because the claimant was performing acts she was instructed to perform that she was exposed to an employment-related risk and not one that was common to the general public. *Id.*

¶ 52    The special concurrence states that it agrees with the analysis employed in *O'Fallon* and finds *O'Fallon* distinguishable from *Adcock* on the basis that "the risk at issue in *O'Fallon* was distinctly associated with (*i.e.*, 'peculiar to') the claimant's employment, rendering a neutral risk analysis unnecessary and inappropriate." *Infra* ¶ 100. Again, however, *O'Fallon* involved common bodily movements like turning and twisting. How are these common bodily movements any different from the acts of bending, reaching, or kneeling, which the special concurrence suggests can never be distinctly associated with, or peculiar to, an individual's employment? Rather than distinguishable, we find *O'Fallon* and *Adcock* are factually similar in that they both involved claimants who were performing acts required by their employment and acts that also happened to involve common bodily movements. As discussed, the claimant in *O'Fallon* injured her back as she turned and twisted her body to pursue a student (313 Ill. App. 3d at 415), whereas the claimant in *Adcock* injured his left knee when he "rotated his left knee inward and turned his body to weld" (2015 IL App (2d) 130884WC, ¶ 3).

¶ 53    Ultimately, the analysis employed in *O'Fallon* is inconsistent with the analysis employed in *Adcock*. The special concurrence's attempt to distinguish the two cases fails and will only result in confusion for those attempting to reconcile them.

¶ 54    The special concurrence in this case also maintains that the supreme court's decisions in *Caterpillar Tractor*, 129 Ill. 2d 52, and *Orsini*, 117 Ill. 2d 38, are consistent with the analysis employed in *Adcock* and contradicted by the majority holding. *Infra* ¶ 80. However, aside from stating the same well known propositions of workers' compensation law, neither supreme court decision in any way supports *Adcock*, nor do they conflict with our analysis in this case.

¶ 55     In *Caterpillar Tractor*, the claimant was a carton packer who completed his shift, left his employer's building to go to his car, and was injured as he stepped off a curb on the employer's property. 129 Ill. 2d at 56. When considering whether the claimant's injury arose out of his employment, the supreme court "first consider[ed] whether the [claimant's] injury resulted from the condition of the employer's premises." *Id.* at 59. Finding that it did not, the court "next consider[ed] whether the claimant was subjected to a greater degree of risk than the general public because of his employment." *Id.* at 61. Ultimately, it determined that the claimant did not prove that he was exposed to a risk not common to the general public. *Id.* at 62.

¶ 56     *Caterpillar Tractor* is factually distinguishable from *Adcock*. In particular, the claimant in *Caterpillar Tractor* was not injured while performing his job duties and there was no apparent connection to the claimant's employment other than that he was injured while on the employer's premises. Moreover, nothing in the supreme court's analysis indicates an intention to employ an *Adcock*-like analysis for cases involving common bodily movements. *Caterpillar Tractor* simply sets forth the same general principles of workers' compensation law as a multitude of other cases. Neither the facts of that case nor the supreme court's rationale require a different analysis than we employ here.

¶ 57     The supreme court's decision in *Orsini* is also not factually similar to *Adcock* (or the class of cases to which the special concurrence seeks to apply it), and it does not support *Adcock*'s definitions of risk. In *Orsini*, 117 Ill. 2d at 41, the claimant was employed by a service station as an automobile mechanic. While awaiting the delivery of parts needed to complete work for his employer, the claimant began adjusting the carburetor on his personal automobile. *Id.* at 42. He was then injured when his car malfunctioned and suddenly lurched forward, pinning his legs between the car and a work bench. *Id.* Ultimately, the supreme court affirmed the Commission's decision that the claimant's injury did not arise out of his work for the employer. *Id.* at 49.

¶ 58     In reaching its decision, the supreme court, again, set forth several well-established principles for compensability under the Act, including that (1) an injury arises out of employment if it "has its origin in some risk so connected with, or incidental to, the employment as to create a causal connection between the employment and the injury," (2) that to arise out of employment "the risk of injury must be a risk peculiar to the work or a risk to which the employee is exposed to a greater degree than the general public," and (3) that a risk is incidental to employment "when it belongs to or is connected with what the employee has to do in fulfilling his duties." *Id.* at 45. The court next noted prior, similar decisions that held "the risk of injury in repairing or working on one's personal automobile is not ordinarily related or incidental to the duties for which [a mechanic] is employed." *Id.* at 46. Further, it stated that, in those cases, the risk from repairing one's own vehicle was deemed "personal in nature" and "*totally unrelated* either *to the duties of [the mechanic's] employment* or the condition of [the] employer's premises." (Emphases added.) *Id.*

¶ 59     The supreme court went on to point out that the claimant's injury in the case before it "came about solely as a result of a defect in [the claimant's] car" and was not due to the requirements of his employment. *Id.* at 46-47. The court also stated the claimant's car "served no purpose relative to his employment duties" and that he had "voluntarily exposed himself to an unnecessary danger *entirely separate* from the activities and responsibilities of his job." (Emphasis added.) *Id.* at 47. Further, the court noted as follows:

- 14 -

"This court has consistently held that where the injury results from a personal risk, as opposed to a risk inherent in the claimant's work or workplace, such injuries are not compensable. [Citations.] Conversely, in those cases where liability was imposed, the injury to the employee occurred as a direct result of a defect in the employer's premises or *was directly related to the specific duties of employment*." (Emphasis added.) *Id.* at 47-48.

Ultimately, the court emphasized that the claimant's injuries were "strictly personal and *totally unrelated to the duties of employment* or the conditions of the employer's premises." (Emphasis added.) *Id.* at 48.

¶ 60    A review of the supreme court's analysis in *Orsini* in its entirety reflects that it does not stand for the proposition set forth in *Adcock* and advocated by the special concurrence in this case. First, *Orsini* is factually distinguishable from those situations addressed by *Adcock* and the special concurrence, where an employee is injured while inarguably performing his job duties and those duties involve common bodily movements or "everyday activities." In *Orsini*, the claimant was not performing any activities necessary or incidental to the fulfillment of his job duties. There was also no "everyday activity" or common bodily movement involved in his injury. Second, the supreme court's decision demonstrates the importance that the nature of a claimant's employment and his specific job duties should play when an arising-out-of determination is made. In fact, the court in *Orsini* stated several times in its decision that the claimant's injury was in no way related to the duties of his employment. Significantly, it stated that liability is found to exist under the Act when the employee's injury "was directly related to the specific duties of employment." *Id.* 47-48.

¶ 61    We find *Orsini*, given its emphasis on the duties of a claimant's employment relative to risk, is consistent with our unanimous decision in *Young* and the following determination in that case:

"[W]hen a claimant is injured due to an employment-related risk—a risk distinctly associated with his or her employment—it is unnecessary to perform a neutral-risk analysis to determine whether the claimant was exposed to a risk of injury to a greater degree than the general public. A neutral risk has no employment-related characteristics. Where a risk is distinctly associated with the claimant's employment, it is not a neutral risk." *Young*, 2014 IL App (4th) 130392WC, ¶ 23.

¶ 62    The special concurrence asserts that the majority analysis cannot be reconciled with at least three previous decisions of this court. *Infra* ¶ 90. Assuming, *arguendo*, that the special concurrence is correct, the same is true of the analysis employed by *Adcock* and the special concurrence as highlighted herein. However, while there may be a lack of complete uniformity among appellate decisions, we maintain that *Young*, the cases upon which *Young* relied (including *Autumn Accolade*), and its progeny are consistent with the manner in which the neutral-risk analysis has historically been applied. This court has stated that "[n]eutral risks include stray bullets, dog bites, lunatic attacks, lightning strikes, bombing, and hurricanes." *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 163, 731 N.E.2d 795, 806-07 (2000). Supreme court case authority bears this out, demonstrating that it has performed a neutral-risk analysis, thereby considering whether a claimant was exposed to a common risk to a greater degree than the general public, in those circumstances which show no apparent connection to the employee's job duties. See *Brady*, 143 Ill. 2d at 545 (truck crashed into the employer's building); *Illinois Bell Telephone Co. v.*

*Industrial Comm'n*, 131 Ill. 2d 478, 481, 546 N.E.2d 603, 604 (1989) (slip and fall in a mall common area); *Caterpillar Tractor*, 129 Ill. 2d at 56 (stepping off a curb); *Doyle v. Industrial Comm'n*, 95 Ill. 2d 103, 104-05, 447 N.E.2d 310, 311 (1983) (vehicle accident while exiting the employer's parking lot); *Campbell "66" Express*, 83 Ill. 2d at 355 (tornado); *Jones v. Industrial Comm'n*, 78 Ill. 2d 284, 285, 399 N.E.2d 1314, 1315 (1980) (car door closed on employee's hand in the employer's parking lot); *Eisenberg v. Industrial Comm'n*, 65 Ill. 2d 232, 233, 357 N.E.2d 533, 534 (1976) (assault on employee while walking to her car after work); *Thurber v. Industrial Comm'n*, 49 Ill. 2d 561, 562-63, 276 N.E.2d 316, 316 (1971) (inexplicable attack by coworker); *Inland Steel Co. v. Industrial Comm'n*, 41 Ill. 2d 70, 71, 241 N.E.2d 450, 451 (1968) (severe storm); *J.I. Case Co. v. Industrial Comm'n*, 36 Ill. 2d 386, 387, 223 N.E.2d 847, 848 (1966) (lightning strike); *Chmelik*, 31 Ill. 2d at 274 (struck by automobile in parking lot); *Hill-Luthy Co. v. Industrial Comm'n*, 411 Ill. 201, 202, 103 N.E.2d 605, 606 (1952) (lighting cigarette and injured by a defective match head); *Permanent Construction Co. v. Industrial Comm'n*, 380 Ill. 47, 48, 43 N.E.2d 557, 558 (1942) (contraction of typhoid fever); *Borgeson v. Industrial Comm'n*, 368 Ill. 188, 189, 13 N.E.2d 164 (1938) (stray bullet).

¶ 63    In other cases, the supreme court has declined to find that an accidental injury was the result of a neutral risk when the employee was performing his job duties. As stated, in *County of Peoria*, 31 Ill. 2d at 564, an off-duty sheriff's deputy was found subject to an employment risk rather than a neutral risk based on his specific job duties, duties which, because of his employment, he had a legal obligation to perform.

¶ 64    Additionally, the supreme court's holding in *Memorial Medical Center v. Industrial Comm'n*, 72 Ill. 2d 275, 381 N.E.2d 289 (1978), is instructive. There, the claimant, who was employed in the housekeeping department of a hospital, was injured when she "bent over" to polish a spot on a door's kickplate. *Id.* at 278. The Commission found the claimant sustained a compensable injury, and the employer appealed. *Id.* at 277. On review, the employer argued "that the act of bending forward [was] a routine motion not peculiar to [the claimant's] work, that the true cause of her disability was her obesity[,] and that the evidence show[ed] that she was not, as a result of her employment, subjected to any greater risk than the public at large." *Id.* at 279. The supreme court rejected the employer's argument and determined the Commission's finding of compensability was not against the manifest weight of the evidence. *Id.* at 281. This decision illustrates that when given the opportunity to broadly hold that common bodily movements, such as bending, are always subject to a neutral-risk analysis, the supreme court has declined to do so.

¶ 65    The special concurrence further asserts that the majority approach is "in tension" with supreme and appellate court decisions that involve the denial of compensation where the employee's health has so deteriorated that the performance of any normal daily activity could have caused the claimant's injury. *Infra* ¶¶ 96-97; see *Hansel & Gretel Day Care Center v. Industrial Comm'n*, 215 Ill. App. 3d 284, 286, 574 N.E.2d 1244, 1245 (1991) (day-care worker who was seated in a child-sized chair and experienced pain in her knee as she attempted to stand); *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347, 348, 553 N.E.2d 732, 733 (1990) (employee who turned in his chair to answer a coworker's question and felt a pop in his back); *Greater Peoria Mass Transit District v. Industrial Comm'n*, 81 Ill. 2d 38, 40, 405 N.E.2d 796, 797 (1980) (bus driver who suffered a shoulder injury after she dropped paperwork, leaned over, lost balance, and struck her shoulder); *County of Cook v. Industrial Comm'n*, 68 Ill. 2d 24, 27, 368 N.E.2d 1292, 1293 (1977) (employee who suffered a stroke as she arose from her

desk to go to lunch); *Board of Trustees of the University of Illinois v. Industrial Comm'n*, 44 Ill. 2d 207, 209, 254 N.E.2d 522, 523 (1969) (employee who turned in his chair after hearing a noise and experienced back pain). It maintains that none of the above-cited cases "makes sense" under the majority's analysis because, under our analysis, the reviewing courts in those cases "would each have found an injury arising out of the claimant's employment without any need to perform a neutral risk analysis." *Infra* ¶ 97.

¶ 66　　　　Again, we must disagree. First, the special concurrence seems to suggest that each of the cases it cites involved a claimant who was performing acts connected with or incidental to his or her employment, and that compensation was denied irrespective of such circumstances. *Infra* ¶ 97. However, the opposite is true. See *Board of Trustees*, 44 Ill. 2d at 214-15 (stating that the claimant's back injury, which occurred when he turned in his chair, "was not caused by a risk incidental to the employment"). In the cases cited, the injuries at issue were found to be unrelated to employment and to have arisen, instead, from a risk personal to the employee as shown by the medical evidence. See *Greater Peoria Mass Transit District*, 81 Ill. 2d at 41 ("[T]he risk of [shoulder] dislocation was personal to [the claimant] and her injury [was] thereby rendered noncompensable under the Act."). In particular, medical evidence demonstrated that each employee had prior health issues and such degenerated physical conditions that any activity could have caused the injuries the claimants ultimately experienced. However, even in the absence of such medical evidence, the risks at issue in those cases likely would have been deemed neutral risks under the same approach that we employ in this case.

¶ 67　　　　Second, the special concurrence ignores the fact that, in order to satisfy the "arising out of" component, a claimant bears the burden of establishing not only that a workplace accident occurred but, in addition, that it caused his injury. *Cassens Transport Co. v. Industrial Comm'n*, 262 Ill. App. 3d 324, 330, 633 N.E.2d 1344, 1348 (1994) ("The claimant in a worker's compensation proceeding has the burden of proving by a preponderance of the credible evidence that the injury arose out of and in the course of employment, and that involves as an element a causal connection between the accident and the condition of claimant."). In other words, even if a claimant can establish an accident originating from an employment-related risk, he or she must still establish a causal connection between that accident and the resulting condition of ill-being. Certainly, where the evidence presented at arbitration supports a finding that the risk of injury was due to a degenerated physical condition, or was otherwise solely personal to the employee, recovery can and should be denied.

¶ 68　　　　Once again, "neutral risks *** have no particular employment or personal characteristics." *Illinois Institute*, 314 Ill. App. 3d at 162. In this case and the others we rely on that employ a similar analysis, issues of personal risk and degenerated physical conditions do not appear to have been at issue. Instead, the Commission and the reviewing courts were essentially presented with employment-risk and neutral-risk alternatives. Under such circumstances, it is appropriate to first consider whether the risk at issue had employment-related characteristics and evidence of such should not be disregarded in favor of automatically finding that an injury arises from a neutral risk simply because the act involves a common bodily movement or "everyday activity." This is the critical point on which we disagree with *Adcock* and the special concurrence.

¶ 69        Ultimately, what makes a risk distinct or peculiar to the employment is its origin in, or relationship to, the specific duties of the claimant's employment. A risk that is required by the claimant's employment and necessary to the fulfillment of the claimant's job duties removes it from the realm of what is common to the general public (a neutral risk) even if the activities attendant to the risk have neutral characteristics, *i.e.*, involve common bodily movements. Although case law has defined neutral risks as those that have no particular employment or personal characteristics, it has not similarly defined employment risks as having no particular neutral characteristics.

¶ 70        Finally, the special concurrence suggests that our analysis expands liability for benefits beyond what the legislature intended and would require a finding of compensability for all injuries simply because they occurred at work. *Infra* ¶ 113. However, as illustrated by this case and our decision in *Noonan*, that is simply not the case. It is the manner in which the special concurrence would analyze what is "incidental to" employment, essentially equating it with "positional risk," that collapses the distinction between the "arising out of" and "in the course of" components of compensation, and not the majority decision. The special concurrence appears critical of the term "incidental to," suggesting that it encompasses activities with no significant relationship to employment. *Infra* ¶ 114. However, the special concurrence ignores the fact that this term is used by supreme court in defining when a risk originates in employment. See *Sisbro*, 207 Ill. 2d at 203; *Caterpillar Tractor*, 129 Ill. 2d at 58; *Orsini*, 117 Ill. 2d at 45.

¶ 71        The special concurrence also ignores that "[a] risk is incidental to the employment when it belongs to or is connected with what the employee *has to do* in fulfilling his duties." (Emphasis added.) *Orsini*, 117 Ill. 2d at 45. If "incidental to" employment were to be defined to include any action that occurs within the time and space boundaries of the employment, then we would agree that such a definition would "arguably authorize compensation for positional risks." *Infra* ¶ 113. However, as shown by our analysis in this case, that is not the way the term has been defined. Rather, we adhere to the supreme court's definition of the term, which does not encompass every activity or risk encountered by an employee while at work no matter how minor and separated it is from the specific duties of employment.

¶ 72        We note the special concurrence asserts that our analysis will require a finding of compensability for injuries that result from the "everyday activity" of walking. *Infra* ¶ 113. Specifically, it contends that, under our approach, "*any* injuries that occur while an employee is performing an act that is necessary to the fulfillment of the employee's work duties (even an activity of daily living such as walking to one's workstation at the employer's premises) 'arise out of' the employment and are therefore compensable if the Act's other requirements are met." (Emphasis in original.) *Infra* ¶ 113. Again, we do not hold that any particular type of injury is automatically compensable, much less any injury that is only connected to the employment by the mere fact that it occurred on the employer's premises. See *Caterpillar Tractor*, 129 Ill. 2d at 59-62 (traversing a curb on the employer's premises did not arise out of the claimant's employment); *Prince v. Industrial Comm'n*, 15 Ill. 2d 607, 611-612, 155 N.E.2d 552, 554 (1959) (stating idiopathic falls on a level floor "present no risk or hazard that is not encountered in many places" and "confront all members of the public"). But see *Rysdon Products Co. v. Industrial Comm'n*, 34 Ill. 2d 326, 330, 215 N.E.2d 261, 263 (1966) (holding that Commission's finding that an injury from an unexplained fall arose out of employment was not against the manifest weight of the evidence where it "could reasonably have inferred

- 18 -

[from the evidence presented] that the claimant's fall was due to his having been overcome or affected by [workplace] fumes, or to his tripping on the uneven [workplace] floor"). Without more, an injury resulting from "walking" as suggested by the special concurrence would not be due to an employment risk.

¶ 73    Here, we simply hold that an "arising out of" determination requires an analysis of the claimant's employment and the work duties he or she was required or expected to perform. Only after it is determined that a risk is not employment-related should the Commission consider and apply a neutral-risk analysis. As stated, the evidence in this case was such that the Commission could properly find that claimant's injury did not stem from an employment-related risk. The risk posed to claimant from the act of standing from a kneeling position while looking for something that had been misplaced by a coworker was arguably not distinctly related to his employment. Claimant's work for the employer did not require him to perform that specific activity. Further, it was the Commission's prerogative to find claimant's act of searching for the misplaced pan of food was too remote from the specific requirements of his employment to be considered incidental to his assigned duties. As a result, the Commission's determination that claimant was not injured due to an employment risk was supported by the record and not against the manifest weight of the evidence.

¶ 74    Certainly, categorization of risk and, ultimately, whether an injury arises out of one's employment is not always easily resolved. Factual circumstances have and will arise where the line between what constitutes an employment risk as opposed to a neutral risk is difficult to ascertain. However, as stated by the supreme court, "no all inclusive rule can be laid down" and "each case must be decided with reference to its own circumstances." *Borgeson*, 368 Ill. at 190. Ultimately, the resolution of whether an injury stems from an employment risk, a neutral risk, or a personal risk is one of fact that is within the province of the Commission to decide based on the particular circumstances of each case. On review, as always, this court should give deference to the Commission's factual findings by employing a manifest-weight-of-the-evidence standard of review.

¶ 75                                III. CONCLUSION

¶ 76    We affirm the judgment of the circuit court of Cook County, which confirmed the Commission's decision.

¶ 77    Affirmed.

¶ 78    PRESIDING JUSTICE HOLDRIDGE, specially concurring:

¶ 79    I agree that the Commission's finding that the claimant failed to prove an accidental injury arising out of his employment was not against the manifest weight of the evidence. I therefore join in the majority's judgment. However, I do so for reasons that are different from those espoused by the majority. In my view, the majority's analysis departs dramatically from governing precedent and would lead to an unwarranted and unworkable expansion of the Workers' Compensation Act (Act) (820 ILCS 350/1 *et seq.* (West 2014)). I write separately to clarify the analysis that I believe should govern claims like the claim asserted in this case.

¶ 80    The majority holds that an accidental injury "arises out of" a claimant's employment for purposes of the Act so long as, at the time of injury, the claimant was performing an act that

was "incidental to" (or "necessary to the fulfillment of") his work duties, even if the act at issue was an activity of everyday living and even if the employment did not increase the risk of injury in any way. This holding contravenes a basic principle of our workers' compensation law: the rule that a claimant may not recover benefits under the Act unless his employment subjected him to some risk or hazard beyond that which is regularly faced by members of the general public. See, *e.g.*, *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 59 (1989) ("if the injury results from a hazard to which the employee would have been equally exposed apart from the employment, *** it is not compensable"); *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 45 (1987) ("If the injury results from a hazard to which the employee would have been equally exposed apart from the employment, then [the injury] does not arise out of [the employment]."); *Adcock v. Illinois Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC, ¶ 38 ("if the injury is caused by an activity of daily life to which all members of the public are equally exposed ***, then there can be no recovery under the Act, even if the employee was required to perform that activity by virtue of his employment"); *O'Fallon School District No. 90 v. Industrial Comm'n*, 313 Ill. App. 3d 413, 416 (2000) ("If *** the employee's exposure to the risk is equal to that of the general public, the injury is not compensable."); *Hansel & Gretel Day Care Center v. Industrial Comm'n*, 215 Ill. App. 3d 284, 293 (1991) (ruling that, to establish that an injury suffered at work "arises out of" the employment, "[a] claimant must show that the injury is due to a cause connected to the employment," and that "recovery is denied *** where the activity engaged in presents risks no greater than those to which the general public is exposed"); see also *Karastamatis v. Industrial Comm'n*, 306 Ill. App. 3d 206, 209-10 (1999). By disregarding this well-established principle, the majority has essentially collapsed the distinction between "arising out of" the employment and "in the course of" the employment, thereby extending the Act well beyond its intended scope. The majority has also substantially reduced the circumstances under which a neutral risk analysis would apply. Moreover, the majority has crafted a vague and unworkable standard for determining when an injury arises out of the employment, a standard that will encourage *ad hoc* judicial decisions as courts struggle to determine which actions are "incidental to" a claimant's employment (often in the absence of any evidence on the subject). The rule we announced in *Adcock*, which the majority overturns today, is clearer and more workable than the rule applied by the majority here. It is also more consistent with the Act's purpose and with governing precedent.

¶ 81    In order to recover benefits under the Act, a claimant bears the burden of proving by a preponderance of the evidence that his injury "ar[ose] out of" and occurred "in the course of" his employment. 820 ILCS 305/2 (West 2014). The requirement that the injury arise out of the employment concerns the origin or cause of the claimant's injury. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). The occurrence of an accident at the claimant's workplace does not automatically establish that the injury "arose out of" the claimant's employment. *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 393 (1995); *Adcock*, 2015 IL App (2d) 130884WC, ¶ 27. "The 'arising out of' component is primarily concerned with causal connection." *Sisbro*, 207 Ill. 2d at 203. An injury "arises out of" the employment if it "has its origin in some risk so connected with, or incidental to, the employment as to create a causal connection between the employment and the injury." *Orsini*, 117 Ill. 2d at 45; see also *Sisbro*, 207 Ill. 2d at 203.

¶ 82       To determine whether an injury arose out of a risk connected to the employment, we must first identify the risk to which the claimant was exposed when he was injured at work. *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 105 (2006). As the majority notes, there are three types of risks to which employees may be exposed: (1) risks that are "distinctly associated" with employment; (2) risks that are personal to the employee, such as idiopathic falls; and (3) neutral risks that do not have any particular employment or personal characteristics. *Potenzo v. Illinois Workers' Compensation Comm'n*, 378 Ill. App. 3d 113, 116 (2007). A risk "distinctly associated" with a claimant's employment is a risk that is "peculiar to the claimant's work" (*Orsini*, 117 Ill. 2d at 45 (1987); *Karastamatis*, 306 Ill. App. 3d at 209), *i.e.*, a risk to which the general public is not exposed (*Karastamatis*, 306 Ill. App. 3d at 209). As noted, a neutral risk is a risk that has "no particular employment or personal characteristics," *i.e.*, a risk "to which the general public is equally exposed." *First Cash Financial Services*, 367 Ill. App. 3d at 105. Injuries resulting from neutral risks are deemed to arise out of the employment only where the employee was exposed to the risk to a greater degree than the general public, either qualitatively or quantitatively, by virtue of his employment. *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 27; *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014 (2011). Injuries resulting from personal risks do not arise out of the employment and are therefore not compensable under the Act. *Orsini*, 117 Ill. 2d at 47 (noting that the Illinois Supreme Court "has consistently held that where the injury results from a personal risk, as opposed to a risk inherent in the claimant's work or workplace, such injuries are not compensable").

¶ 83       Accordingly, "[f]or an injury to have arisen out of the employment, the risk of injury must be a risk peculiar to the work or a risk to which the employee is exposed to a greater degree than the general public by reason of his employment." *Id.* at 45; *Noonan v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 152300WC, ¶ 18. "[I]f the injury results from a hazard to which the employee would have been equally exposed apart from the employment, or a risk personal to the employee, it is not compensable." *Caterpillar Tractor Co.*, 129 Ill. 2d at 59; see also *Orsini*, 117 Ill. 2d at 45; *Noonan*, 2016 IL App (1st) 152300WC, ¶ 18.

¶ 84       In this case, the claimant was injured while standing up from a kneeling position, which is an activity of everyday living. There is no evidence that his injury was caused by a risk personal to him, such as an idiopathic fall. Moreover, the risk of injury that the claimant confronted was not peculiar to his work (*i.e.*, it was not "distinctly associated" with his employment). Rather, as the Commission correctly found, it was a neutral risk of everyday living faced by all members of the general public. Thus, the claimant's injury is compensable only if the claimant was exposed to this risk to a greater degree than the general public because of his employment. *Adcock*, 2015 IL App (2d) 130884WC, ¶ 33; *Springfield Urban League*, 2013 IL App (4th) 120219WC, ¶ 27.

¶ 85       The claimant failed to make that showing here. The claimant testified that he was not carrying or holding anything when he stood up from a kneeling position and injured his knee. Nothing struck his knee or fell on his knee. The claimant did not trip over anything, and he noticed no cracks or defects on the floor. Although the claimant testified that it was "always wet" in the walk-in cooler, he did not notice "anything out of the ordinary," and he did not claim that he slipped on a wet surface. Rather, he was simply standing up from a kneeling position when he felt his knee "pop." The claimant agreed that the kneeling position he

assumed while looking for the carrots was similar to the position he would be in while "looking for a shoe or something under the bed." Thus, the claimant's own testimony confirms that the claimant was injured while performing an activity of daily living (standing up from a kneeling position on a normal surface) and that his employment did not increase or enhance the risk of injury in any way.[1] The Commission's decision denying benefits was therefore not against the manifest weight of the evidence.[2]

¶ 86    Although the majority agrees that the claimant failed to show that his injury arose out of his employment, it takes issue with my analysis. Specifically, the majority rejects *Adcock*'s ruling that claims for injuries caused by activities of daily living (such as walking, turning, bending, and kneeling), should be analyzed under neutral risk principles even if they occur while the claimant is performing acts incidental to his work duties. *Supra* ¶ 38. In rejecting *Adcock*'s analysis and holding, the majority relies heavily upon our supreme court's statement that

> " 'an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties.' " (Internal quotation marks omitted.) *Supra* ¶ 41 (quoting *Sisbro*, 207 Ill. 2d at 204).

See also *The Venture—Newberg-Perini, Stone & Webster v. Illinois Workers' Compensation Comm'n*, 2013 IL 115728, ¶ 18; *Ace Pest Control, Inc. v. Industrial Comm'n*, 32 Ill. 2d 386, 388 (1965). The majority interprets this statement as establishing that an injury results from a risk that is "distinctly associated with the employment" (and therefore "arises out of" the employment under the Act) whenever the employee is injured while performing any act that is "incidental to" with his employment duties, which the majority defines as any act that is "necessary to the fulfillment" of the employee's job duties. According to the majority, such injuries are deemed to "arise out of the employment" without the need to perform a neutral risk analysis, *i.e.*, without the employee having to show that his employment increased the risk beyond the risk faced by members of the general public.

¶ 87    In my view, the majority misinterprets the supreme court's statement and applies it in an unduly expansive manner that contravenes the Act. In *Sisbro* and in other decisions, our supreme court has stated that "an injury arises out of one's employment if, at the time of the occurrence, the employee was performing *** acts which the employee might reasonably be expected to perform incident to his assigned duties." (Internal quotation marks omitted.) *Sisbro*, 207 Ill. 2d at 204. However, our supreme court has made it clear that this is merely another way of stating the requirement that, for an injury to "arise out of" the employment

---

[1] The claimant argues that his testimony that he knelt down to look for the carrots under the walk-in cooler because "sometimes things get knocked underneath the shelves *** on[to] the floor" suggested that his job required him to kneel more frequently than members of the general public. However, the claimant offered no testimony as to how often he knelt down to look for food items under the cooler. He testified only about the single occasion that led to his injury. Given the evidence presented, the Commission was not required to infer that the claimant was required to kneel more often than members of the general public. The Commission's inference that the claimant knelt only once at work was reasonable and was not against the manifest weight of the evidence.

[2] As the majority notes, the undisputed facts in this case are susceptible to different reasonable inferences. Therefore, I agree with the majority that the manifest weight of the evidence standard applies. See *supra* ¶ 23.

under the Act, the risk that produced the injury must be causally connected to (or "incidental to") the employment. See *id.* Thus, in making the statement at issue, the supreme court was simply declaring that, in order to satisfy the Act's "arising out of" requirement, the claimant must have been injured while doing something incidental to his employment duties.[3] This describes a *necessary* condition for satisfying the Act's "arising out of" requirement; it does not describe a *sufficient* condition for satisfying that requirement. It means that a claimant may not prove that his injury "arose out of" his employment without showing that the injury occurred while he was doing something incidental to his job duties. However, it does not suggest that the claimant may satisfy the "arising out of" requirement in every instance *merely by making that showing*. In other words, *Sisbro* suggests that only injuries sustained during the performance of work-related acts arise out of the employment, not that all such injuries always arise out of the employment.

¶ 88    This makes perfect sense. For purposes of the Act, the dispositive question is whether the *risk* that led to the injury had its origin in the employment. *Id.* at 203. As noted above, a risk has its origin in the employment only if (1) the risk is "peculiar to the employment" (*i.e.*, a job-related risk that is not faced by members of the general public) or (2) the risk is common to the general public but is increased or enhanced in some way by virtue of the employment, thereby exposing the claimant to hazards not shared by the public. Not all acts that are necessary to the fulfillment of an employee's job duties (or otherwise incidental to those duties) present such risks. For example, the employment might require the employee to perform activities of daily living incidental to his job duties, such as walking, bending, or kneeling. Although these everyday activities might be necessary to the fulfilment of the employee's job duties, the risks presented by such everyday activities are not peculiar to any particular line of employment. Such risks have their origin in the employment only if the employment increased the risks beyond that which is faced by members of the general public (for example, by requiring the employee to perform those activities of daily living more often than members of the general public or in a manner that enhances the risk of injury). Unless the employment increases or enhances the risk in one of these ways, injuries that occur while an employee is performing activities of daily living do not arise out of the employment, even if they are incidental to the employee's job duties.

¶ 89    The majority's expansive interpretation of our supreme court's statement in *Sisbro* and other cases is inconsistent with these principles and with governing case law. Our supreme court has never held that injuries caused by activities of daily living "arise out of" the employment merely because such activities are necessary or incidental to the claimant's work duties. To the contrary, our supreme court has made it clear that an injury sustained at work "arises out of the employment" only if the risk causing the injury originates in the employment (*id.*), *i.e.*, only if the employment exposes the claimant to a risk to which members of the general public are not equally exposed, either because the risk is peculiar to the employment or because the risk is enhanced by the employment. *Caterpillar Tractor Co.*, 129 Ill. 2d at 58-59;

---

[3]Injuries caused by activities that have no such causal connection to the claimant's job duties are not compensable, even if they occur "in the course of" the employment (*i.e.*, during work hours while the claimant is at work). See, *e.g.*, *Orsini*, 117 Ill. 2d 38.

- 23 -

*Orsini*, 117 Ill. 2d at 45. The majority's reading of *Sisbro* and other cases contravenes this principle and extends the Act beyond what the legislature intended.[4]

In addition, the majority's analysis cannot be reconciled with several decisions of this court that were decided prior to *Adcock*. See, *e.g.*, *Kemp v. Industrial Comm'n*, 264 Ill. App. 3d 1108 (1994); *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103 (1994); *Komatsu Dresser Co. v. Industrial Comm'n*, 235 Ill. App. 3d 779 (1992). In each of these cases, we applied a neutral risk analysis where the claimant was injured while performing an activity of daily living, even though the claimant was performing his work duties or some act incidental thereto at the time. For example, in *Kemp*, 264 Ill. App. 3d at 1109, the claimant injured his back while squatting down to read an air meter, which was one of his work duties. We affirmed the circuit court's decision awarding benefits because we held that the claimant's job required him to bend and stoop in a manner that "differ[ed] in both the type and frequency from the type of bending and stooping in which the average member of the general public could be expected to ordinarily engage." *Id.* at 1111. In other words, we analyzed the claimant's claim according to neutral risk principles, notwithstanding the fact that the claimant was injured while performing an act that was necessary to the fulfillment of his work duties.

Similarly, in *Komatsu Dresser Co.*, 235 Ill. App. 3d at 780-81, the claimant injured his back as he bent over to pick up a machine part while performing his work duties. (The claimant also sneezed as he bent over. *Id.* at 781.) However, we did not stop our analysis there and find the claimant's injury was compensable merely because he was injured while performing an act incident to his employment. Instead, we applied a neutral risk analysis and affirmed the

---

[4]The excerpt from *Sisbro* that the majority quotes (*supra* ¶ 43) neither supports the majority's expansive interpretation of the Act's "arising out of" requirement nor undermines my analysis. *Sisbro*'s holding addressed a *causation* issue; it did not address whether the claimant's accidental injury "arose out of" his employment. In *Sisbro*, our supreme court held that the evidence presented in that case supported the Commission's finding that the claimant's work-related accident aggravated or accelerated his preexisting diabetic leg condition such that the claimant's current condition of ill-being was causally related to the work accident. *Sisbro*, 207 Ill. 2d at 215. The employer in *Sisbro* "[did] not seriously dispute" the Commission's finding that the claimant had sustained an accidental injury arising out of and in the course of his employment. *Id.* at 204. Thus, our supreme court had no occasion to address that issue in *Sisbro*. In the language quoted by the majority, the *Sisbro* court merely held that, *where the evidence supports a finding of an actual causal connection between the claimant's condition of ill-being and a work accident*, causation will not be denied merely because the activity that triggered the injury presented no risks greater than those faced by the general public or because the claimant's preexisting condition was so severe that the disabling injury could have been caused by any activity of daily living. *Id.* at 211-12. Our supreme court took care to stress that the latter factors "are matters to be considered when deciding whether a sufficient causal connection between the injury and the employment has been established in the first instance." *Id.* at 212. Thus, the court made clear that these factors could, in principal, preclude a finding of causal connection between the work injury and the claimant's condition of ill-being. *Sisbro*'s holding merely establishes that, when such a causal connection has been established (*e.g.*, through competent medical testimony, as in *Sisbro*), the employer may not negate that causal connection merely by showing that the injury *might* also have occurred as a result of some normal daily activity. *Id.* at 211. Contrary to the majority's suggestion, *Sisbro* does not hold that an injury arises out of the employment if the claimant sustained the injury while performing tasks incidental to his employment, even where those tasks posed no risks beyond the risks faced by members of the general public on a daily basis.

Commission's award of benefits only after we concluded that the evidence supported a "reasonable inference that the claimant's acts of bending required by his work exposed [him] to a greater degree of risk than that of the general public." *Id.* at 788. Specifically, we held that the claimant's job required him to lift 15- to 40-pound parts out of a box on a regular basis without bending his knees. Because this "increased the claimant's exposure to risk of injury from *** bending" beyond the risk faced by members of the general public (both quantitatively and qualitatively), we held that "the fact that bending is a normal activity did not preclude a finding that the claimant's injury arose out of his employment." *Id.*; see also *Nabisco Brands, Inc.*, 266 Ill. App. 3d at 1107 (affirming Commission's decision that claimant's injury arose out of his employment where the claimant slipped and fell while walking down stairs carrying three long, heavy bakery knives, an act he was required to do in fulfilling his work duties because the need to carry the knives was "unique" to the claimant's employment and it increased the impact and the dangerous effects of his fall on the stairs).[5]

¶ 92    In each of these cases, we held that it was the *origin of the risk* that produced the injury, not the fact that the claimant was performing some work-related act at the time of injury, that determined whether the claimant's injury arose out of his employment. The majority's approach contradicts this principle and cannot be reconciled with *Kemp*, *Nabisco Brands*, or *Komatsu Dresser*. If the majority's approach were correct, there would have been no need to conduct a neutral risk analysis in those cases because, in each case, the claimant was injured while performing acts that were required by or incidental to his work duties. In the majority's view, that fact alone would have established that the claimant's injury arose out of his employment.

¶ 93    The majority tries to circumvent this problem by simply asserting that a risk has its origin in the employment whenever the injury resulted from the performance of an act necessary to the fulfillment of the claimant's job duties. See *supra* ¶ 42 (asserting that "[r]isks attendant to" acts that the employer instructs the claimant to perform, acts that the claimant had a common law or statutory duty to perform, or acts incidental to the claimant's assigned duties "have their origin in the claimant's employment," and "[w]hen an employee is injured while performing such acts it cannot be said that he is subject to a neutral risk, *i.e.*, a risk that has no particular employment characteristics and is common to the general public"); *supra* ¶ 48 ("Activities necessary to the fulfillment of a claimant's job duties present risks that are distinct or peculiar to the employment and, as a result, are not common to the general public."); *supra* ¶ 69 ("Ultimately, what makes a risk distinct or peculiar to the employment is its origin in, or relationship to, the specific duties of the claimant's employment. A risk that is required by the

[5]Significantly, each of these cases was decided after our supreme court issued its decision in *Caterpillar Tractor Co.*, which includes a statement that is substantively identical to the *Sisbro* statement upon which the majority relies. See *Caterpillar Tractor Co.*, 129 Ill. 2d at 58 (ruling that "[t]ypically, an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties"). (When making the same statement, the *Sisbro* court cited *Caterpillar Tractor Co.* as precedent. *Sisbro*, 207 Ill. 2d at 204.) In *Komatsu Dresser*, we cited this statement from *Caterpillar Tractor Co.* but nevertheless applied a neutral risk analysis to the claimant's claim. This demonstrates that we have already rejected the majority's unduly expansive interpretation of the supreme court's statement in *Sisbro*.

claimant's employment and necessary to the fulfillment of the claimant's job duties removes it from the realm of what is common to the general public (a neutral risk) even if the activities attendant to the risk have neutral characteristics, *i.e.*, involve common bodily movements."); see also *supra* ¶ 45. That defies common sense. The risks associated with any particular activity arise from the activity itself, not from the activity's relationship to the claimant's work duties. For example, the risk of injury posed by a single act of standing up from a kneeling position remains the same regardless of whether the act is performed at work or at home, and regardless of whether the act is necessary to the fulfillment of the claimant's job duties. The fact that a particular activity is necessary or essential to the performance of a claimant's job duties, without more, has no bearing on the origin or nature of the risk presented by the activity. The risk stems from the nature of the activity itself, not from its connection to an employment-related purpose.

¶ 94　　Accordingly, we may reasonably say that the risk of a particular activity "has its origin in the employment" only if (1) the activity is unique to a particular line of work (*e.g.*, welding or operating dangerous machinery), such that members of the general public do not perform the activity, or (2) the employment requires the claimant to perform a common activity more frequently than members of the general public or in a manner that otherwise increases the risk of the activity. Under those circumstances (and only under those circumstances), the risk of injury associated with the activity is directly affected by the employment. Although the risks associated with an activity are always created by the activities themselves (and not by their association with an employment-related purpose), it makes sense to say that such risks "have their origin" in the employment in the two circumstances outlined above because, in those instances, the particular risks at issue would not be encountered but for the employment.

¶ 95　　By contrast, according to the majority's view, the risk of an activity of daily living is somehow deemed to originate with the employment merely because the activity is required by the employment, even though nothing about the employment creates or enhances the risk of injury associated with the activity. In my view, that position defies logic and common sense. Moreover, as I noted above, it contravenes the basic and well-established principle that a claimant may not recover benefits under the Act unless his employment subjected him to some risk or hazard beyond that which is regularly faced by members of the general public. (See, *e.g.*, *supra* ¶ 80.) The majority attempts to sidestep this principle by fiat, *i.e*, by simply asserting that the risks associated with any act necessary to the employment have their origin in the employment and are not common to the general public. That assertion cannot be reconciled with several of our prior decisions (see, *e.g.*, *Kemp*, 264 Ill. App. 3d 1108; *Komatsu Dresser Co.*, 235 Ill. App. 3d 779), and it flouts common sense by suggesting that the risk associated with an activity is somehow dependent upon whether the activity has an employment-related purpose.

¶ 96　　The majority's approach is also in tension with some of the supreme court and appellate court decisions wherein compensation has been denied to claimants who were injured while performing their work duties because their health had so deteriorated that the performance of any normal daily activity could have caused the claimant's injuries. See, *e.g.*, *Greater Peoria Mass Transit District v. Industrial Comm'n*, 81 Ill. 2d 38 (1980); *County of Cook v. Industrial Comm'n*, 68 Ill. 2d 24 (1977); *Board of Trustees of the University of Illinois v. Industrial Comm'n*, 44 Ill. 2d 207 (1969); *Hansel & Gretel Day Care Center*, 215 Ill. App. 3d at 294; *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347 (1990). Recovery is denied under such

circumstances because "the injury result[s] from a hazard personal to the claimant and, therefore, [does] not arise out of [the] claimant's employment." *Hopkins*, 196 Ill. App. 3d at 352. Once again, the dispositive factor is whether the risk has its origin in the employment. If it does not, the fact that the claimant was injured while performing an act related to his work duties is immaterial and does not justify recovery under the Act. *Id.*; see also *County of Cook*, 68 Ill. 2d at 33 (holding that, because "[t]he work-connected activity (getting up from [a] chair) which *** precipitated claimant's injury subjected her to no greater risk than did *** normal daily activities," "[t]he mere fact that she was at work *or even engaged in some job-related activity* when the episode occurred is not sufficient to support an award" (emphasis added)); *Greater Peoria Mass Transit District*, 81 Ill. 2d at 43 (reversing Commission's award of benefits to claimant injured while performing a work-related task "because neither qualitative nor quantitative risks to the claimant were shown to be greater as a result of her employment").

¶ 97    None of these decisions makes sense according to the majority's analysis. If, as the majority maintains, an injury arises out of the claimant's employment whenever the act the claimant was performing at the time of injury was incidental to his employment, then the courts in *County of Cook*, *Greater Peoria Mass Transit*, and *Hopkins* would each have found an injury arising out of the claimant's employment without any need to perform a neutral risk analysis. But that is not the case. In each case, the dispositive factor was not whether the *act* the claimant was performing was necessary to the fulfillment of his job duties, but whether the *risk* that led to the injury was created (or, at least, enhanced in some way) by the employment. Where the employment subjected the claimant to no risks beyond those encountered by the general public (*i.e.*, where the claimant's claim failed under a neutral risk analysis), recovery was denied. We should deny the claimant's claim in this case for the same reason.

¶ 98    The majority contends that the analysis we employed in *Adcock* is "at odds" with certain decisions of our supreme court and of this court. *Supra* ¶¶ 38, 63-64. The supreme court cases cited by the majority are distinguishable. In *County of Peoria v. Industrial Comm'n*, 31 Ill. 2d 562 (1964), our supreme court held that an off-duty sheriff's deputy who was struck by a vehicle and killed while attempting to push a motorist's car from a ditch was entitled to benefits. The majority suggests that the fact that the supreme court did not explicitly perform a neutral risk analysis in *County of Peoria* somehow supports its argument in this case and undermines our analysis in *Adcock*. *Supra* ¶¶ 44-45, 63. I disagree. In *County of Peoria*, the supreme court found that, by virtue of his employment as a sheriff's deputy, the decedent had a duty to help motorists in distress at all times, even when he was off duty. *County of Peoria*, 31 Ill. 2d at 563-64. Members of the general public have no such duty. *Id.* at 564. Based on this fact, the supreme court held that the claimant's employment-related duty "exposed him to a risk greater than that faced by the public generally." *Id.* at 565. Accordingly, the risk that caused the fatal injury was peculiar to the decedent's employment, and there was no need to perform a neutral risk analysis.[6] Here, by contrast, the risk that led to the claimant's injury

---

[6]As noted above, a neutral risk analysis is required only where the risk at issue is one "to which the general public is equally exposed." *First Cash Financial Services*, 367 Ill. App. 3d at 105. If the risk is unique to the employment and is not shared by the general public, there is no need for a neutral risk analysis. It should be noted, however, that the decedent in *County of Peoria* would have recovered benefits even under a neutral risk analysis. If the risk of assisting a stranded motorist were deemed a risk common to the general public, the decedent in *County of Peoria* was subjected to that risk more frequently than the general public by virtue of his employment. The supreme court may have actually

arose from an activity of daily living (standing up from a kneeling position). Such risks are common to the general public and are not peculiar to the claimant's employment. *County of Peoria* is therefore inapposite.

¶ 99      The majority also relies upon *Memorial Medical Center v. Industrial Comm'n*, 72 Ill. 2d 275 (1978). *Supra* ¶ 64. In that case, the claimant worked as a housekeeper in a hospital. Her job duties including cleaning. She was injured at work when she bent over from a standing position in order to clean a spot off a kickplate on a door. *Memorial Medical Center*, 72 Ill. 2d at 278. The employer argued that "the act of bending over [was] a routine motion not peculiar to [the claimant's] work, that the true cause of [the claimant's] disability was her obesity[,] and that the evidence show[ed] that she was not, as a result of her employment, subjected to any greater risk than the public at large." *Id.* at 279. Our supreme court's cursory analysis in *Memorial Medical Center* appears to be focused entirely on the issue of causation, not the question whether the claimant's injury arose out of her employment. It is not clear whether, or to what extent, our supreme court actually considered the employer's argument that the risk leading to the claimant's injury did not arise out of the employment because it was a risk common to members of the general public. In any event, our supreme court cited *County of Cook* for the proposition that "where it is shown that the activity engaged in presented risks no greater than those to which the general public is exposed, compensation will be denied." *Id.* at 281 (citing *County of Cook*, 68 Ill. 2d at 32-33). As noted above, the majority's analysis in this case cannot be reconciled with that principle. Accordingly, *Memorial Medical Center* reaffirms a basic principle that the majority's analysis contravenes, and it does not support the majority's expansive interpretation of the Act's "arising out of" requirement.

¶ 100      The decisions of this court upon which the majority relies are, in my view, either distinguishable or wrongly decided. The majority claims that the analysis we employed in *Adcock* is "at odds with" our decisions in *O'Fallon*, 313 Ill. App. 3d 413, *Autumn Accolade v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120588WC, *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, *Noonan*, 2016 IL App (1st) 152300WC, *Mytnik v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 152116WC, and *Steak 'n Shake v. Illinois Workers' Compensation Comm'n*, 2016 IL App (3d) 150500WC. *Supra* ¶ 38. *O'Fallon* is distinguishable. The claimant in that case was a sixth grade teacher who was ordered to ensure the safety of children moving through the school's hallways. *O'Fallon*, 313 Ill. App. 3d at 414-15. Her duties included preventing children from running in the halls, and she "was ordered specifically to undertake the risk of pursuing a running student." *Id.* at 417. She injured her back when she turned, twisted, and began to pursue a child running in the hall. *Id.* We affirmed the Commission's award of benefits because we held that the risk that gave rise to the claimant's injury (*i.e.*, the risk of twisting, turning, and pursuing a running child) arose out of her employment, would not have existed if not for her employment duties, and exposed her to a risk greater than that faced by the general public. *Id.* at 417-18. Accordingly, the risk at issue in *O'Fallon* was distinctly associated with (*i.e.*, "peculiar to") the claimant's employment, rendering a neutral risk analysis unnecessary and

decided the case on that basis, implicitly applying a neutral risk analysis. In either event, *County of Peoria* is distinguishable from this case.

- 28 -

inappropriate.[7] In this case, by contrast, the risk at issue did not originate with the employment but with an activity of daily living to which members of the general public were equally exposed. Thus, as noted, a neutral risk analysis is required in this case.

¶ 101    The remaining decisions of this court cited by the majority apply the same analysis the majority applies in this case. For the reasons I have articulated in this special concurrence and in other cases, I believe that each of those decisions was wrongly decided, and I would not follow them.[8]

¶ 102    The majority also argues that *Adcock* is contrary to the requirement that the Act must be liberally construed to effectuate its remedial purpose of providing financial protections for injured workers. *Supra* ¶¶ 39-40. The majority maintains that "the manner in which *Adcock* addresses the 'arising out of' element gives the Act a narrow construction" by "broadening the

---

[7]The majority maintains that *O'Fallon* is inconsistent with *Adcock*. *Supra* ¶ 53; see also *supra* ¶¶ 51-52. I disagree. In *O'Fallon*, the claimant's employment subjected her to risks peculiar to her employment that exceeded the risks faced by members of the general public. The claimant was required to pursue running students, which required her to turn and twist quickly and then immediately run after young students. Pursuing running students in this manner is not an activity of daily living. Thus, the claimant's employment posed risks not generally faced by members of the general public. The majority's conclusion that *O'Fallon* cannot be reconciled with *Adcock* appears to be based on an overly broad reading of *Adcock*. The majority interprets *Adcock* (and my position in this special concurrence) as standing for the proposition that injuries "involving common bodily movements" can "never" be found to have resulted from a risk that is peculiar or distinct to a particular line of employment. *Supra* ¶ 51. *Adcock*'s holding is not so broad. Almost every work task involves some common bodily movements. However, some work tasks expose an employee to risks peculiar to the employment. For example, welders risk suffering burns while welding. *Adcock* acknowledges that injuries caused by such risks are "peculiar to" the employment. That is true regardless of whether the claimant was also performing common bodily movements (such as standing, bending, or turning) while he was injured. However, *Adcock* also holds that injuries *caused entirely by activities of daily living* (and not by any risks peculiar to the employment) should be analyzed under neutral risk principals. Thus, if the claimant in *Adcock* (a welder) had burned himself while welding, the Commission could have properly found that his work injury arose out of his employment without conducting a neutral risk analysis, even if he was performing certain "common bodily movements" at the time. However, because the *Adcock* claimant was injured while turning in his chair, an activity performed by members of the general public on a daily basis that involved no risks peculiar to welding, a neutral risk analysis was required. In other words, because the *Adcock* claimant alleged an injury that was *caused entirely* by a common bodily movement (and not by any risky activity distinctly associated with welding), we correctly analyzed his claim under neutral risk principles.

[8]In my special concurrence in *Steak 'n Shake*, I applied a neutral risk analysis (following *Adcock*) and disagreed with the majority's contrary analysis. *Steak 'n Shake*, 2016 IL App (3d) 150500WC, ¶¶ 57-63 (Holdridge, P.J., specially concurring, joined by Hudson, J.). In my special concurrence in *Noonan*, 2016 IL App (1st) 152300WC, ¶ 41 (Holdridge, P.J., specially concurring), I noted that I would decline to follow our prior decisions in *Young* and *Autumn Accolade* because each of those cases erroneously failed to apply a neutral risk analysis. However, I joined the majority's analysis in *Noonan* in all other respects. I also joined the majority's analysis in *Mytnik*. Upon further reflection, I now believe that both *Noonan* and *Mytnik* applied an incorrect analysis, and I disavow my concurrences in those cases. If I were to revisit *Noonan* and *Mytnik*, I would specially concur in the judgment in each of those cases, but I would apply a neutral risk analysis.

definition of neutral risk." *Supra* ¶ 40. The majority contends that *Adcock* places an added burden on claimants seeking to recover benefits under the Act. *Supra* ¶ 40.

¶ 103    Contrary to the majority's suggestion, *Adcock* does not construe the Act in an unduly narrow manner or make it more difficult for claimants to obtain benefits. The neutral risk analysis we employed in *Adcock* would have allowed the claimant to recover benefits in every case that the majority's approach has done so. For example, in *Steak 'n Shake*, the evidence established that the claimant's job required her to wipe down multiple tables in a hurry in order to keep the flow of customers moving. *Steak 'n Shake*, 2016 IL App (3d) 150500WC, ¶ 62 (Holdridge, P.J., specially concurring, joined by Hudson, J.). As the Commission in that case correctly found, this exposed the claimant to a risk greater than that encountered by the general public, both quantitatively and qualitatively. *Id.* Accordingly, the claimant in *Steak 'n Shake* was entitled to compensation under a neutral risk analysis. *Id.*

¶ 104    In *Mytnik*, the claimant worked on an assembly line, and his job required him to quickly retrieve any bolts that fell on the assembly line to prevent the line from jamming. *Mytnik*, 2016 IL App (1st) 152116WC, ¶¶ 5-6. The claimant was injured as he was reaching down to grab a bolt that had fallen on the assembly line. Because the claimant's job required him to reach down to retrieve fallen bolts repeatedly and in a hurried manner (and to perform other repetitive movements which, according to one of his doctors, subjected his lower back to " 'repetitive mechanical stresses' " (*id.* ¶ 17)), the claimant's employment arguably exposed him to risks that were quantitatively and qualitatively greater than those faced by the general public. Thus, he would have recovered benefits under a neutral risk analysis.

¶ 105    Similarly, the facts presented in *Young* and *Autumn Accolade* would arguably have supported recovery under a neutral risk analysis because the claimant in each case was injured while performing a common bodily movement (reaching) in an unusual manner that increased the risk of injury beyond that posed by ordinary acts of reaching. In *Young*, the claimant was injured while reaching and stretching his arm into a deep, narrow box to retrieve a part for inspection. *Young*, 2014 IL App (4th) 130392WC, ¶ 5. In *Autumn Accolade*, the claimant was injured while helping a resident of an assisted care facility take a shower. *Autumn Accolade*, 2013 IL App (3d) 120588WC, ¶ 4. As she held the resident with one hand to keep her from falling, the claimant turned to the left, bent forward, and reached toward a soap dish with her other hand, injuring her neck in the process. *Id.* In each case, the claimant was injured while performing everyday activities in an unusual manner that arguably exposed the claimant to a risk not faced by members of the general public by virtue of his or her employment. Accordingly, in each case, a neutral risk analysis would have supported an award of benefits.

¶ 106    The majority further maintains that "[a]n *Adcock* analysis will, in effect, place an extra evidentiary burden on many employees who are injured while performing their job duties or activities closely connected with the fulfillment of their assigned duties by requiring those employees to present evidence comparing their activities with those of the general public." *Supra* ¶ 40. This begs the question by assuming that an injury arises out of the employment whenever it occurs while the claimant is performing some act incidental to his work duties. As noted above, that is not the case. In order to prove that his injury arose out of his employment under the Act, a claimant must show that the risk giving rise to the injury had its origin in his employment, *i.e.*, that the risk was not faced by members of the general public. A claimant may make that showing either by demonstrating either that (1) the risk was peculiar to the employment, *i.e.*, not common to the public, or (2) although it was common to the general

- 30 -

public, the risk was increased or enhanced in some way by virtue of the employment. Accordingly, under existing law, a claimant may not prove that his injury arose out of his employment without comparing the risks posed by his work duties with the risks faced by members of the general public. *Adcock* merely applies this existing law as it is; it does not add any new burden of proof for claimants or impose any new restrictions under the Act. By contrast, the majority's approach would change existing law by eliminating the claimant's burden to prove that the risk had its origin in his employment (*i.e.*, by declaring that all injuries sustained while a claimant is performing an act incidental to his work duties arise out of the employment).

¶ 107    In addition to its fidelity to the law, *Adcock* applies a simple, analytically clear, and workable rule that that provides clear guidance to the Commission, lower courts, and members of the bar. The majority's approach, by contrast, sows confusion among the Commission and the lower courts and encourages *ad hoc* decisions based upon conjecture as to which actions are "incidental to" the claimant's employment (often without the benefit of any evidence on the subject). Our decision in *Noonan*, 2016 IL App (1st) 152300WC, provides a good example of this, in my view. In *Noonan*, we upheld the Commission's denial of benefits to a claimant who injured his wrist at work when he fell from a rolling chair as he reached to retrieve a pen he had dropped on the floor. The claimant's job required him to fill out forms by hand. Nevertheless, applying the same analysis it applies in this case, a majority of our court held that the claimant's act of bending over to pick up a dropped pen was not "distinctly associated" with his employment because it was not an act that the employer "might reasonably have expected [the claimant] to perform incident to" his job duties. *Id.* ¶¶ 26-27. That conclusion strikes me as highly implausible and counterintuitive, and it does not appear to be based on any evidence in the record. In my view, it is certainly foreseeable that an employee who spends a good portion of his workday filling out forms by hand would drop his pen periodically and would have to pick it up in order to continue performing his assigned duties. As Justice Stewart noted in his dissent in *Noonan*, the majority's contrary finding in that case "defies common sense." *Id.* ¶ 44 (Stewart, J., dissenting). Under the analytical framework that the majority has applied in this case, in *Noonan*, and other cases, there was no basis to deny the claimant benefits in *Noonan*. Because the claimant was injured while performing an act that was incidental to his job duties, he should have recovered benefits pursuant to the majority's approach.[9]

---

[9]The majority argues that the claimant in *Noonan* was not entitled to benefits because he dropped the pen "as a result of his own clumsiness" and because the evidence did not establish that his attempt to pick up the pen was " 'incidental to' *** what he had to do in[ ] the fulfillment of his specific job duties." *Supra* ¶ 50. However, as noted above, the act of picking up a dropped pen was clearly necessary to the fulfillment of the claimant's specific job duties because his job required him to fill out forms by hand. Thus, by the majority's own definition, the claimant's act of picking up a pen was "incidental to" his job duties. Further, even assuming *arguendo* that the claimant dropped the pen "as a result of his own clumsiness" (which was not a finding reached by the Commission or an issue addressed by our court on appeal), that fact would not preclude recovery so long as the clamant was required to use a pen in performing his work duties. See *Gerald D. Hines Interests v. Industrial Comm'n*, 191 Ill. App. 3d 913, 917 (1989) ("It matters not how negligently the employee acted, if at the time he was injured he was still within the sphere of his employment and if the accident arose out of it.").

¶ 108	According to the neutral risk analysis we applied in *Adcock*, however, the claimant in *Noonan* was clearly not entitled to benefits. The risk of falling while bending over in a rolling chair to pick up a pen was not peculiar to Noonan's employment, and there was no evidence that Noonan's employment increased the risk of injury in any way. Accordingly, in my view, it would have been analytically clearer, more legally sound, and more persuasive to uphold the Commission's rejection of benefits in *Noonan* based entirely upon a neutral risk analysis. If we had applied *Adcock* in that case rather than *Young* and its progeny, we would have reached the same correct result ultimately reached by the majority without having to apply tortured logic in order to conclude that reaching for a dropped pen was not incidental to the claimant's job duties.

¶ 109	In my view, the majority's analysis in this case suffers from the same flaws as the *Noonan* decision. Before correctly applying a neutral risk analysis, the majority first concludes that the act the claimant was performing at the time of his injury (looking for carrots) was "too remote from the specific requirements of his employment to be considered incidental to his assigned duties." *Supra* ¶ 73; see also *supra* ¶ 31. That conclusion strikes me as dubious. The claimant's job duties as a sous chef included preparing food and arranging the walk-in cooler. Looking for carrots under the walk-in cooler in order to assist another chef in preparing food seems to me to be undoubtedly "incident to" his duties as a sous chef, regardless of whether he was specifically ordered to look for the carrots by a supervisor. Thus, if the majority's analysis were correct (*i.e.*, if all injures sustained during the performance of acts incidental to one's job duties arise out of one's employment), I believe we would have no choice but to reverse the Commission's decision and award benefits to the claimant. However, because I believe that *Adcock*'s neutral risk analysis should govern the claimant's claim, I would skip the first step of the majority's analysis (which I find to be both erroneous and unnecessary), and I would affirm the Commission's denial of benefits solely under neutral risk principles for the reasons set forth above.

¶ 110	The majority contends that "an *Adcock*-type analysis" (*i.e.*, a neutral risk analysis) "invites decisions by the Commission based on speculation," conjecture, or "gut level assumptions" as to how often and in what manner members of the general public perform various activities of daily living. *Supra* ¶ 47. The majority queries whether expert testimony will always be required to establish these facts. *Supra* ¶ 47. I have no doubt that, in certain instances, the Commission may legitimately infer whether the employment increased the risk of a particular activity of daily living beyond that faced by members of the general public based entirely upon common sense and the Commissioners' life experience, without the need of expert testimony. For example, if an employee's job requires him to walk up 10 steps once or twice per shift, the Commission may reasonably infer that the employment did not increase the risk beyond that faced by members of the general public. Conversely, if the job requires the employee to climb 10 steps 50 times per shift, the Commission may reasonably draw the contrary inference. (The Commission has drawn such inferences in prior cases, and we have upheld such inferences.) In closer cases, expert testimony may well be required. If members of the bar knew that *Adcock* provided the governing analysis in such cases, the parties in such cases would be on notice to present expert testimony supporting their respective arguments under a neutral risk analysis, where appropriate. In my view, this will place no greater burden on litigants than the majority's approach, which will require the parties to present evidence and arguments regarding which tasks are "necessary to the fulfillment of" a claimant's job duties.

¶ 111        I will close by attempting to correct some misapprehensions that the majority appears to have regarding *Adcock*. The majority suggests that *Adcock* "automatically exclude[s] from the definition of an employment-related risk activities that might involve common bodily movements or which *Adcock* terms 'everyday activities.' " *Supra* ¶ 38. I disagree. *Adcock* and the cases upon which it relies establish that a risk associated with an activity of daily living has its origin in the employment (*i.e.*, is an "employment-related risk") if the employment increases or enhances the risk in some way, either quantitatively or qualitatively. *Adcock*, 2015 IL App (2d) 130884WC, ¶ 32. In other words, a risk of everyday living may be found to be an employment-related risk under a neutral risk analysis. See *id.* ¶¶ 32-34. My disagreement with the majority on this issue appears to be based upon our differing definitions of "employment-related" risks. In my view, a risk is "employment-related" if it is peculiar to the employment *or* if it is a common risk that is enhanced by the employment beyond that which the general public faces. Put another way, in my view, a risk is "employment-related" whenever it "arises out of the employment," regardless of whether the risk is "peculiar to" the employment or merely enhanced by the employment. In the majority's view, by contrast, an injury is the result of an "employment-related" risk (*i.e.*, is "distinctly associated with" the employment) if the act the claimant is performing at the time of the injury is incidental to his work duties. For the reasons set forth above, I believe that my view is more consistent with the Act and with prior precedent.

¶ 112        One further clarification seems appropriate. I agree with the majority that, once we have determined that a risk is "peculiar to" the employment, the injury is thereby deemed to have arisen out of the employment, and we do not need to apply a neutral risk analysis to the claim. A risk that is "peculiar to" the employment is, by definition, one to which the general public is *not* exposed. See *Orsini*, 117 Ill. 2d at 45; *Karastamatis*, 306 Ill. App. 3d at 209.[10] Because such risks are not faced by members of the general public, we do not need to conduct a neutral risk analysis in such cases. However, I do not agree with the majority's suggestion that a risk may deemed "peculiar to" the employment (and therefore one that "arises out of the employment" under the Act) merely because the activity that caused the injury was essential to the claimant's work duties, even if that activity did not subject the employee to hazards beyond those faced by the general public. Any such suggestion flatly contradicts numerous decisions of our supreme court and of our court. See *supra* ¶ 80.

¶ 113        In sum, I believe the analysis applied in *Adcock* is sound and is preferable to the analysis applied by the majority in this case, among other reasons, because (1) it upholds the well-established principle that a claimant may not recover under the Act for risks faced by members of the general public unless those risks are somehow increased or enhanced by the employment; (2) it applies an analytically clear and workable rule that will provide clear guidance to the Commission, lower courts, and members of the bar, whereas the majority's analysis will sow confusion and encourage *ad hoc* decision-making; and (3) it would not unduly restrict eligibility for compensation under the Act, whereas the majority's analysis would expand eligibility for benefits well beyond what the legislature intended by rendering

---

[10]The majority appears to treat the phrase "peculiar to the employment" as synonymous with "employment-related" and "distinctly associated with the employment." The majority interprets all three of these phrases to mean acts that are incidental to the employment. By contrast, following *Orsini* and *Karastamatis*, *Adcock* defines a risk "peculiar to the employment" as a risk that is unique to the employment, *i.e.*, a risk *not* faced by the general public.

any injury directly connected to the performance of an employee's essential job duties potentially compensable, even if the employment did not increase or enhance the risk of injury in any way. Under the majority's approach, *any* injuries that occur while an employee is performing an act that is necessary to the fulfillment of the employee's work duties (even an activity of daily living such as walking to one's workstation at the employer's premises) "arise out of" the employment and are therefore compensable if the Act's other requirements are met. That would collapse the distinction between "arising out of" the employment and "in the course of" the employment and would arguably authorize compensation for positional risks.

¶ 114    The majority maintains that its analytical approach will not render positional risks compensable or otherwise unduly expand the definition of "employment-related" work injuries because (1) only injuries incurred while performing acts "incidental to" the employment are compensable and (2) an activity (and its associated risk) is "incidental to" the employment only if it "belongs to or is connected with what the employee *has to do* in fulfilling his duties" (emphasis in original and internal quotation marks omitted) (*supra* ¶ 71), *i.e.*, only if the act the claimant was performing at the time of his injury was "necessary to the fulfillment of his specific job duties" (*supra* ¶ 46). However, contrary to the majority's suggestion, the majority's definition of "incidental to" the employment is broad enough to authorize compensation for a wide variety of everyday activities that have not previously been deemed compensable. For example, under the majority's approach, if an employee has to walk across a normal surface or up and down stairs in order to perform his work duties, any injury he sustains while walking across the floor or navigating the stairs would be deemed to arise out of his employment, even if his employment did not increase the risk of these everyday activities beyond that faced by the general public on a daily basis. Employees regularly have to perform a host of everyday actions in order to fulfill their work duties. Such actions present neutral risks that are ordinarily not compensable unless the employment somehow increased the risk quantitatively or qualitatively.[11]

¶ 115    In my view, the Commission applied the proper analysis (*i.e.*, a neutral risk analysis, as prescribed by *Adcock*) and reached the proper conclusion. The Commission's findings were not against the manifest weight of the evidence. I would therefore affirm the Commission's decision in all respects.

¶ 116    JUSTICE HOFFMAN joins in this special concurrence.

---

[11]Contrary to the majority's suggestion, I do not define an act "incidental to" the employment as being equivalent to a "positional risk." See *supra* ¶ 70. I define that phrase the same way the majority and our supreme court define it, *i.e.*, as a risk that is connected to what an employee has to do in fulfilling his job duties. Unlike the majority, however, I recognize that this definition will include various activities of daily living regularly performed by members of the public (such as walking across a normal surface or up and down stairs), because such activities are often necessary to the performance of an employee's job duties. If all such activities are deemed to "arise out of the employment," as the majority maintains, then such common daily activities could be compensable even if the employment does not increase the risk beyond that faced by the general public. It is that result (and not our shared definition of acts "incidental to" the employment) that threatens to collapse the distinction between "arising out of" the employment and "in the course of" the employment, and that would arguably authorize compensation for positional risks.